Howard T. Hogan, J.
In this consolidated tax certiorari proceeding the parties at the opening of trial stipulated to withdraw and discontinue the writs for the years May 1, 1966, through May 1, 1971, for Lot 23, Section 8, Block 234 on the Land and Tax Map of Nassau County. The remaining property, Lot Numbers 17 and 18, Section 8, Block 235, comprises 3.83 acres as found by petitioner’s engineer, improved at various times with several structures.
Both parties agree that during the years under review, the present use is its highest and best which consists of a restaurant, bank, medical office building, subsurface bowling alley, and a metal building used by an optometrist. In 1967, a store was demolished. Since 1969, the improvements have been fully rented. It was stipulated that the contract rents and 11 overages ” for the years under review ranged from $152,400 per year to $402,907, which included arrears, with the actual collections ranging from $125,000 to $370,000'.
Petitioner’s values were bottomed upon a free and clear basis, disregarding the mortgage and insurance. The court has heretofore expressed its opinion that the presence or absence of a mortgage is of no concern to a tax assessor and, having stated its reasons therefor in Matter of Mid-Island Shopping Plaza v. Podeyn (25 Misc 2d 972, 989, affd. 14 A D 2d 570, affd. 10 N Y 2d 966), it adheres to that opinion. To this may he added the insurance, likewise, for this too, in and of itself, is no determinor of value.
Petitioner and respondent valued the land by market data. The improvements were valued by petitioner as they existed on the dates under review, except as to those which were demolished and/or in construction during any one year. This property has substantial frontage along Union Turnpike in excess of 700 feet and a depth of 291 feet. Contiguous on the east is a community type shopping center.
With his economic approach, petitioner’s appraiser elected a vacancy factor ranging from about 7% to 20%. To this was *43 added a management fee ranging to 4%. In his analysis of estimated income and expense, he did not include the rent of $10,000 per year for the lease of the fixtures and chattels in the restaurant, but testified that his allocation of $50,000 per year included the contract rent of $40,000 plus his estimate of what the economic rent projection for overages should be. Between 1969 and 1971 the bank and the professional buildings were added. These were not fully rented until June, 1969. In 1969, the restaurant and trailer were vacant.
For raw land values for each of the years under review the experts found as follows:
DATE
PETITIONER
RESPONDENT
May 1, 1966 $360,000 $650,000
May 1, 1967 400,000 750,000
May 1, 1968 435,000 750,500
May 1, 1969 480,000 792,500
May 1, 1970 525,000 834,000
May 1, 1971 545,000 834,000
In using the market data for land, both agreed upon one parcel as being comparable. This sale, at the northeast corner of Jericho Turnpike and Marcus Avenue about five miles distant, is an area of 6.81 acres and reflects a sales price of $146,843 per acre in January, 1971.
For location and time, principally, petitioner adjusted this downward 50%, but respondent held that the better way to value land was on a square-foot basis and noted that his same sale reflected a value of $3.30 per square foot. His values over the years of his comparables ranged from a low of $1.75 per square foot in 1961, to a high of $4.50 in 1966, which was a half-acre parcel in a superior location. Even these, however, he adjusted upward to reflect unit values ranging from $4 per square foot in 1966, to $5 in 1971. This court finds his adjustments for land as well as his basis of measurement lack support. The court adopts the one sale upon which both agree as being comparable, and by allocating 10% for superior location of subject property and 25% for time for the first five years, finds an indicated land value for the years under review as follows:
LAND
1966 3.83 acres $500,000
1967 >> 530,000
1968 560,000
1969 J 9 590,000
1970 >> 620,000
1971 620,000
*44 Applying these values to the stipulated ratios, the land assessments are sustained except for the first year.
Since the improvements varied from year to year, each of the years must be considered separately. The contract rents having been rejected by both, resort must be had to the “ actual estimated ” income or economic approach to find value. Implicit in the analysis of both appraisers is the finding that — at least in the early years under review — the tenants were paying a rental below economic rental which they have proscribed for the leasehold estate. They anticipate an income stream of not only what the contract rent provided but also the additional rent the owner could have received if the property were to be leased for the first time on a given tax status date. Both adopted this method despite the fact some of the tenants could not even make the contract rent until 1970 and despite the further uncontroverted evidence the owner made strenuous efforts to find tenants.
If contract rent is to be ignored, it must be demonstrated by clear, convincing evidence that the contract rent is below the true market.
Assessment (Real Property Tax Law, § 102, subd. 2) is the so-called true value at which property is assessed and the price at which the property will sell in the market under ordinary circumstances. In arriving at the “ true value ” for tax assessment purposes, appraisal is made of the property as a whole. The bona fide leases upon the subject property are matters which must be considered in determining market value for tax assessment purposes. While ‘ ‘ assessments cannot be made to trail behind every turn in the fortunes of real property ” and while there are instances " when property must bear a share of taxation proportionate to value even though it may then have no income, or an income inadequately focused to true value ” (People ex rel. 379 Madison Ave. v. Boyland, 281 App. Div. 588, 590), nevertheless, “ the actual rent realized is significant as an important factor in determining what the fair rental value is.” (People ex rel. Gale v. Tax. Comm, of City of N. Y., 17 A D 2d 225, 230; Woolworth Co. v. Commission of Taxation & Assessment of City of Plattsburgh, 26 A D 2d 759, 760).
Rental income established by leases is a matter to be considered in determining the full value of the property for tax assessment purposes.
The burden of proof that the assessment is erroneous is upon the owner. When his proof, based upon the actual income *45 and/or the fair estimated income obtained from the market, meets that requirement, the burden then shifts to the respondent to demonstrate by clear convincing evidence that the estimated economic rent, which respondent projects, reflects the prevailing market. In other words, the respondent must show, from market data or other evidence, that the leasehold income is unrealistically low, not representative of the fair rental value of the property and, consequently, may not be used as a basis for calculating actual value, that is to say, that the true value of the property for assessment purposes is to be ascertained as if unencumbered by such leases.
What have we here? Both experts chose the economic approach to valuation. Both estimated what they believed the income should be. “ Value arrived at by capitalization of the fair rental value is, in ordinary cases, the surest guide to a sound appraisal.” (Woolworth Co. v. Commission of Taxation & Assessment of City of Plattsburgh, 26 A D 2d 759, 760, supra.)
Yet neither offered any leases or sales or market data, save the leases and the history of the subject property itself. This is of dubious help, except where, as in this case, the owner testified at length to the history of the property, of his search in the market place for tenants. The evidence is that the rents obtained were the prevailing rates in the market when made. These leases were neither improvident, nor were these made in times of depression, nor were these entered into by an unknowledgeable developer. (People ex rel. 379 Madison Ave. v. Boyland, 281 App. Div. 588, supra; Matter of Dunn Garden Apts. v. Commissioner of Assessment & Taxation of City of Troy, 11 A D 2d 879.) The petitioner had more than 30 years’ experience in the investment and development of real property. His knowledge was extensive as were his developments.
The profit from rental income has now become less, not because of the lack pf good business judgment on the part of the owner, but because of increased taxes due to the general increase in the entire cost of living. Should the owner now be penalized? Could any reasonably prudent businessman anticipate the enormity of tax increases and/or cost of living 10 or 15 years ago?
Here, the court must weigh what the sales price of the property would be in the open market to establish its value. The history of the property, its outstanding leases, the income *46 stream, i.e., the so-called “ bottom line ”, are all strong determiners of full market value. 1‘ Of course, an outstanding bona fide lease and the rental income established thereby are matters to be considered in determining ‘ the full value ’ of the whole property, land and improvements. Value arrived at by capitalization of the fair rental value is, in ordinary cases, the surest guide to a sound appraisal. In that connection, the actual rent realized is significant as an important factor in determining what the fair rental value is.” (People ex rel. Gale v. Tax Comm. of City of N. Y., 17 A D 2d 225, 230, mot. for lv. to app. den. 12 N Y 2d 646, supra.)
In this case it is clear the rental was a fair rental when made.
This court agrees with other decisions which hold that assessors are not required to conform their assessments rigidly to an unprofitable use of real estate by a taxpayer and that assessors are not required to underwrite an unprofitable venture to the detriment of the tax district. (People ex rel. Lyford v. Allen, 286 App. Div. 621.)
However, with the traditional test of “ market value ”, what investor will purchase real property without primary concern for the “ bottom line ”? The prudent investor’s first concern is with his return now and in the foreseeable future — not what his bundle of rights may be many years hence. The totality of the lessor’s and lessee’s interest is weighed but the weight to be given to each depends upon the return on the investment and duration of the leases.
How does this interpretation apply to a situation as here — where the owner did command the full potential of his property when the leases were entered into? His judgment was sound when the leases were made. The rentals reflected the market at that time.
This court finds it difficult to reconcile the concepts of “ full value ” as if there were no leases and to have the assessment fixed at the prevailing market value of similarly improved property which is not burdened by leaseholds. This is not what is done in the market place. When a willing buyer and willing seller enter into negotiations and agree upon the full or market value, each of necessity considers the current yield as well as income potential in the foreseeable future.
By the same token this court recognizes that an imprudent developer or investor should not be the responsibility of the other *47 taxpayers within the district. What I do say is that, when the economic method is used to determine value:
(1) Leases entered into in good faith which represent the market when made must he given by far the greater weight in estimating so-called full or market value for assessment purposes.
(2) When using the income or economic approach to value, such approach must be buttressed by evidence of leases of comparable property to arrive at a fair economic value. Otherwise, estimates are purely speculative.
(3) Absent market studies of comparable properties, the contract rent must be accorded substantial weight.
The assessment is fixed on May 1 in each of the years under review. The assessors on.that date make .a judgment of the market value of the real property for the ensuing year, not some date 10 or 20 years later.
While it is true that boards of assessors cannot be expected to follow the fluctuations of the net income of each property on the tax rolls, it should not be ignored when clear evidence is submitted after an audit.
Neither party made any attempt either to offer sales of comparable properties (except for raw land sales), or to offer leases of comparable buildings. In the absence of this evidence the court must rely upon the capitalization of income as each of the experts estimated that which in his opinion the income should have been. Petitioner’s appraiser based his valuation primarily upon what he termed the “ actual estimated income ”. By this, of course, he meant that income which he as an appraiser believed the property should produce. The respondent’s appraiser followed the same technique.
During the first three years under review, part of the subject property was unimproved. This area is estimated by respondent’s appraiser to be 35,000 square feet in 1966, and 60,000 square feet in 1967 and 1968. This vacant land he valued at $140,000 in 1966 and $260,000 in 1967 and 1968. With this approach the court disagrees. Where the entire land has once been valued, it may not be included again.
The court adopts the estimated annual expenses found in the report of audit by the respondent’s Director of Accounting for use in determining effective net income for capitalization.
Based upon the detailed history of this property, this court gives greatest weight to the contract rent, to which it has added an appraised economic rent for each of the years.
*48 The evidence indicates the following:
MAY 1, MAY 1, MAY 1, MAY 1, MAY 1, MAY 1, BUILDINGS 1966 1967 1968 1969 1970 1971 Restaurant............ $50,000 $50,000 $50,000 $50,000 $60,000 $85,000 Bowling.............. 95,000 95,000 100,000 100,000 100,000 115,000 Bank................. 30,000 30,000 30,000 Medical building....... 10,000 160,000 200,000 185,000 Trailer............... 6,000 6,000 6,000 6,600 7,200 8,600 Furniture building..... 20,000 Gross income.......... $171,000 $151,000 $166,000 $346,600 $397,200 $423,600 Less 2vacancy.... 4,275 3,775 4,150 8,665 9,930 10,590 $166,725 $147,225 $161,850 $337,935 $387,270 $413,010 Less expenses, per respondent........... 9,395 9,355 15,290 40,727 50,753 81,427 Net.................. $157,330 $137,870 $146,560 $297,208 $336,517 $331,583
Adopting respondent’s over-all capitalization rates for < each of the years, the total appraised value is:
May 1, 1966........... ........ ‘5[gQg° =$1,203,000 rounded. May 1, 1967........... 107 07/) ........ Í354 = 1,020,000 rounded,. May 1, 1968........... ........ 14^g° = 1,000,000 rounded. May 1, 1969........... OQ7 ono ......... - - =' 1,863,370 rounded. May 1, 1970........... ......... = 2,022,400 rounded. . 1664 May 1, 1971........... 331,583 „ _n. ........ • — 5-5x5—= 2,117,500 rounded. . 1566
In accordance with the above, the court finds the full values for each of the years as follows:
SECTION 8, BLOCK 235 LOTS 17 AND 18
May 1, 1966 Land........................................... $500,000
Improvements................................... 703,000
Total.......................................... $1,203,000
' May 1,1967 Land........................................... 530,000
Improvements................................... 490,000
Total........................................... $1,020,000
*49 SECTION 8, BLOCK 235 LOTS 17 AND 18
May 1, 1968 Land........................................... $560,000
Improvements................................... 440,000
Total........................................... -$1,000,000
May 1, 1969 Land........................................... 590,000
Improvements................................... 1,273,370
Total........................................... $1,863,370
May 1, 1970 Land........................................... 620,000
Improvements................................... 1,402,400
Total........................................... $2,022,400
May 1, 1971 Land........................................... 620,000
Improvements................................... 1,497,500
Total........................................... $2,117,500
It is noted that when respondent’s “ excess ” land (which he twice valued) is deducted from his appraisal, the assessment for each of the first three years under review is not sustained.
Based upon the stipulated ratio of 33%% for the first three years, 32% for the fourth year, and 30% for each of the last two years, the court finds the property overassessed in each of the years under review.
It is true, petitioner has access to the main highway over another parcel of land owned by the State and acquired for highway purposes, pursuant to a revocable permit granted by the State. Petitioner has had full unobstructed use of this area which accommodates the parking of 68 autos for petitioner’s operation. Under this permit, the State has allowed petitioner not only to park vehicles but has permitted the paving and curbing of the area, the installation of sewerage and drainage, as well as complete access to and from petitioner’s property to the main highway. While this use is one at sufferance, it has continued undisturbed since 1959 and, is indeed a valuable adjunct to petitioner’s property. Until the State revokes this permit, however, complete access as well as frontage plus valuable parking is afforded petitioner. Hence, I find for the years under review this property enjoyed full and complete access to Union Turnpike.
Respondent is directed to reduce the assessments accordingly. However, the reduction is to be based on the total full value found by the court and not upon the allocation as between land and buildings set forth above.