■ In the Matter of COUNTY DOLLAR CORP., Respondent, v CITY OF YONKERS et al., Appellants. — In consolidated proceedings pursuant to article 7 of the Real Property Tax Law to review assessments for purposes of taxation on certain real property for the assessment years 1962 through 1976, inclusive, the appeal is from so much of a judgment of the Supreme Court, Westchester County (Sullivan, J.), dated June 10, 1981, as reduced the assessments for the assessment years 1963 through 1976. Judgment affirmed insofar as appealed from, without costs or disbursements. In our opinion there was ample evidence supporting and justifying the reductions in assessments ordered by the trial court. Further, we are of the opinion that its factual and legal analysis of the evidence in this highly complex case was correct and we would affirm on its opinion (see *People ex rel. MacCracken v Miller,* 291 NY 55), except that the trial court's citation and utilization of the case of *Caroldee Realty Corp. v Board of Assessors* (73 Misc 2d 41), requires some comment and a summary review of the evidence pertaining to petitioner's reliance upon its *actual* rental income, as stabilized, in its income capitalization process. The subject of these consolidated proceedings is the Cross County Shopping Center, a regional shopping center located in the City of Yonkers. During the period under review the property was improved with some 21 buildings, with two major department stores (Gimbels and Wanamakers) and numerous satelite stores and offices. Although both real estate appraisal experts used the income capitalization approach, the city's expert, Roland R. Greco, also utilized a cost approach based upon information supplied by an engineer and upon Greco's own estimated land value. Greco's use of the cost approach was included to augment his income approach valuations. In his report, he stated: "An increment representing a potential increase in value was selected between the summation and the

income value. This increment reflects a judgment that a prudent purchaser would consider with full knowledge of the center's actual and potential gross sales, expenses and market rental". Petitioner's real estate expert, Theodore J. Powers reported his opinion of the fair market value of the land and improvements for the years under review as follows:

| YEARS | LAND | IMPROVEMENT | TOTAL |
|-------|------|-------------|-------|
| 1962 | 3,805,000 | 13,320,000 | 17,125,000 |
| 1963 | 4,170,000 | 13,475,000 | 17,645,000 |
| 1964 | 4,540,000 | 12,855,000 | 17,395,000 |
| 1965 | 4,905,000 | 12,230,000 | 17,135,000 |
| 1966 | 5,270,000 | 11,665,000 | 16,935,000 |
| 1967 | 5,635,000 | 10,590,000 | 16,225,000 |
| 1968 | 6,000,000 | 9,610,000 | 15,610,000 |
| 1969 | 6,370,000 | 8,735,000 | 15,105,000 |
| 1970 | 6,735,000 | 8,140,000 | 14,875,000 |
| 1971 | 6,970,000 | 9,640,000 | 16,610,000 |
| 1972 | 7,340,000 | 9,775,000 | 17,115,000 |
| 1973 | 7,705,000 | 9,855,000 | 17,560,000 |
| 1974 | 8,075,000 | 10,025,000 | 18,100,000 |
| 1975 | 8,440,000 | 11,660,000 | 20,100,000 |
| 1976 | 8,805,000 | 12,510,000 | 21,315,000. |

Greco testified that the fair market value was as follows:

| YEARS | LAND | IMPROVEMENT | TOTAL |
|-------|------|-------------|-------|
| 1962 | 7,740,000 | 15,110,000 | 22,850,000 |
| 1963 | 8,100,000 | 15,836,000 | 23,935,000 |
| 1964 | 8,505,000 | 16,530,000 | 25,035,000 |
| 1965 | 8,930,000 | 17,003,000 | 25,933,000 |
| 1966 | 9,375,000 | 17,619,000 | 26,994,000 |
| 1967 | 9,835,000 | 17,261,500 | 27,096,500 |
| 1968 | 10,335,000 | 17,345,000 | 27,680,000 |
| 1969 | 10,840,000 | 15,360,000 | 26,200,000 |
| 1970 | 11,380,000 | 15,700,000 | 27,080,000 |
| 1971 | 11,815,000 | 17,765,000 | 29,580,000 |
| 1972 | 12,405,000 | 19,290,000 | 31,695,000 |
| 1973 | 13,000,000 | 19,975,000 | 32,975,000 |
| 1974 | 13,825,000 | 19,215,000 | 33,040,000 |
| 1975 | 14,330,000 | 19,370,000 | 33,700,000 |
| 1976 | 15,055,000 | 19,910,000 | 34,965,000. |

In prior litigation concerning this shopping center the Court of Appeals, in the case of *Matter of Atlas Realty Inv. v Lennox* (34 NY2d 780, affg 38 AD2d 739 on mem at App Div), determined that the sale of the property in question on January 28, 1960 for the approximate sum of $22,500,000 was an arm's length transaction and evidence of " 'the *highest rank* to determine the true value of the property as of that time' " (38 AD2d 739, 740, quoting *Matter of Woolworth Co. v Tax Comm. of City of N.Y.*, 20 NY2d 561, 565). Accordingly, at bar, Special Term considered the $22,500,000 price of the property at its sale in 1960 as evidence of the highest rank for the assessment years 1962, 1963 and 1964 and accorded it "some weight" against the values found by the court's income approach for the 1965 assessment year. The court fixed the 1965 value at $21,000,000. Utilizing the income approach for the remaining years, Special Term concluded that the values were:

| | |
|---|---|
| 1966 | 20,000,000 |
| 1967 | 18,000,000 |
| 1968 | 17,500,000 |
| 1969 | 16,800,000 |
| 1970 | 16,700,000 |
| 1971 | 18,715,000 |
| 1972 | 17,800,000 |
| 1973 | 20,200,000 |
| 1974 | 20,030,000 |
| 1975 | 20,150,000 |
| 1976 | 21,315,000. |

Applying petitioner's ratios, Special Term sustained the assessment for the assessment year 1962 but granted reduction for the other years. The original assessment under review, the parties' indicated assessments, and Special Term's findings of assessment and reductions were:

| ASSESSMENT YEARS | ASSESSED VALUE | COURT'S FINDING OF ASSESSMENT | PETITIONER'S INDICATED ASSESSED VALUE | APPELLANT'S INDICATED ASSESSED VALUE | COURT'S REDUCTION IN ASSESSMENT |
|---|---|---|---|---|---|
| 1962 | 12,403,350 | 12,825,000 | 9,761,250 | 13,024,500 | |
| 1963 | 12,436,450 | 12,150,000 | 9,528,300 | 12,924,900 | 286,450 |
| 1964 | 12,553,950 | 11,925,000 | 9,219,350 | 13,268,550 | 628,950 |
| 1965 | 12,553,950 | 10,710,000 | 8,738,850 | 13,225,830 | 1,843,950 |
| 1966 | 12,553,950 | 10,200,000 | 8,636,850 | 13,766,940 | 2,353,950 |
| 1967 | 12,553,950 | 9,180,000 | 8,274,750 | 13,819,215 | 3,373,950 |
| 1968 | 12,553,950 | 8,925,000 | 7,961,100 | 14,116,800 | 3,628,950 |
| 1969 | 12,553,950 | 8,400,000 | 7,552,500 | 13,100,000 | 4,153,950 |
| 1970 | 12,553,950 | 7,515,000 | 6,693,750 | 12,186,000 | 5,038,950 |
| 1971 | 12,553,450 | 7,673,150 | 6,810,100 | 12,127,800 | 4,880,800 |
| 1972 | 12,513,250 | 7,120,000 | 6,846,600 | 12,678,000 | 5,393,250 |
| 1973 | 12,650,400 | 7,878,000 | 6,848,400 | 12,860,250 | 4,772,400 |
| 1974 | 12,650,400 | 7,144,701 | 6,456,270 | 11,785,368 | 5,505,699 |
| 1975 | 12,650,400 | 6,893,315 | 6,876,210 | 11,528,770 | 5,757,085 |
| 1976 | 12,651,600 | 6,893,271 | 6,893,270 | 11,307,681 | 5,758,327. |

On this appeal the appellant City of Yonkers claims that reversal is required because the actual income, as allegedly stabilized by petitioner's expert and as utilized by him and by Special Term, was not reflective of the rental market, that it was, in fact, submarket, and that a capitalization process using the actual income (and expense) could not and did not result in ascertainment of the true value of the shopping center. It is contended that Special Term totally disregarded the teaching of *Matter of Merrick Holding Corp. v Board of Assessors* (45 NY2d 538). We conclude, however, that Special Term's reduction in the assessments should be upheld. Special Term's decision correctly noted: "Both Mr. Powers [petitioner's expert] and Mr. Greco [appellants' expert] used an income approach to valuing the property. Both appraisers determined the actual gross income of the property as a starting point. They basically agreed as to the actual gross income of the property although their numbers were slightly different for some of the years under review, that difference being insignificant. Mr. Powers then proceeded to 'stabilize' the actual gross income and Mr. Greco disregarded the actual gross income and on the premise that the

property had been mismanaged and that there was significant future developmental potential to the property, he estimated what he considered to be an economic gross rental value of the property based upon numerous leases within and without the shopping center itself." Special Term further stated: "It is elementary that 'if contract rent is to be ignored, it must be demonstrated by clear, convincing evidence that the contract rent is below the true market.' *Caroldee Realty Corp. v Board of Assessors of the County of Nassau,* 73 Misc. 2d 41, 44. The burden of proving this is on the party asserting it. *Matter of E.L. Nezelek Development Corporation v City of Binghamton,* 61 AD2d 1108". As we have noted, Special Term's utilization of the *Caroldee Realty Corp.* case (*supra*) raises some questions relative to the weight to be given actual rents in the income capitalization approach. *People ex rel. Gale v Tax Comm.* (17 AD2d 225) is probably the most famous case dealing with the subject and it contains the following language (p 230): "Of course, an outstanding bona fide lease and the rental income established thereby are matters to be considered in determining 'the full value' of the whole property, land and improvements. Value arrived at by capitalization of the fair rental value is, in ordinary cases, the surest guide to a sound appraisal. In that connection, the actual rent realized is significant as an important factor in determining what the fair rental value is. (See *People ex rel. Parklin Operating Corp.* v. *Miller,* 287 N. Y. 126, 129, 130, *supra; People ex rel. Manhattan Sq. Beresford* v. *Sexton,* 284 N. Y. 145, 149; *People ex rel. Luce* v. *Lewis,* 257 App. Div. 724.) But when there is evidence that factors such as long-term leases made under distress or boom conditions affect the actual rent, the weight to be given to the actual rent must be discounted accordingly. (See *People ex rel. 379 Madison Ave.* v. *Boyland,* 281 App. Div. 588, *supra; Matter of Dunn Garden Apt.* v. *Commissioner of Assessment,* 11 A D 2d 879; cf. *Ettlinger* v. *Weil,* 184 N. Y. 179, 183.) So, the existence of an outstanding lease at an unrealistically low rental for a long term, not representing the fair rental value of the property, is not to be used as a basis for calculating actual value. Thus, the true value of the property for assessment purposes is to be ascertained as if unincumbered by such a lease". *Matter of Pepsi-Cola Co. v Tax Comm.* (19 AD2d 56, 60), restated the proposition but referred to bona fide rentals actually paid as "highly significant", as did the court in *Matter of Nezelek Dev. Corp. v City of Binghamton* (61 AD2d 1108). In the *Nezelek* case, the Appellate Division, Third Department, also asserted that the taxpayer's burden in a tax review proceeding was to prove the erroneousness of the assessment by "clear and convincing evidence", a burden that could be met by proof of the income or rent (see *Matter of Nezelek Dev. Corp. v City of Binghamton, supra,* p 1109; see, also, *Matter of Barker's Stores v Board of Review,* 74 AD2d 994). In *Caroldee Realty Corp. v Board of Assessors* (73 Misc 2d 41, 44-45, *supra*), nisi prius declared that: "The burden of proof that the assessment is erroneous is upon the owner. When his proof, *based upon the actual income* and/or the fair estimated income obtained from the market, meets that requirement, *the burden then shifts to the respondent* to demonstrate *by clear convincing evidence* that the estimated economic rent, which respondent projects, reflects the prevailing market" (emphasis supplied). Finally, in *Matter of Merrick Holding Corp. v Board of Assessors* (45 NY2d 538, 543, *supra*), the Court of Appeals, in upholding the assessor's use of leasehold bonuses to compensate for submarket long-term lease rents, commented that "realized income will often turn out to be the surest indicator of full value" but went on to assert that: "when fair market rents exceed rental income the latter may, in whole or in part, be made to defer to more precise means of fixing a base on which to compute capitalization (see Encyclopedia of Real Estate Appraising [Friedman ed, 1968], pp 40-41; 1 Bonbright, Valuation of Property, p 229; see Babcock, The Valuation of Real Estate, pp 384-385). So, *if examina-*

*tion discloses* that rent has been arbitrarily set without regard to the market rental value whether through self-dealing, as, for example, where a landlord and tenant are business affiliates or property is owner-occupied (*Woolworth Co. v Commission of Taxation,* 26 AD2d 759), or, certainly, where there is any indication of collusion, the rent arrangement will be of little, if any, guidance to sound appraisal. On the other hand, in arriving at their valuations, assessors may always consider below market rents that result from arm's length bargaining carried out in good faith. Courts recognize, however, that reliance on contract rents, particularly those involving property subject to below market longterm leases, may yield distorted valuations and that an assessor, therefore, may apply compensatory measures calculated to adjust such income figures to a point at which they become reliable indicators of full value (see *People ex rel. Gale v Tax Comm.,* 17 AD2d 225, *supra; Westbury Drive-In v Board of Assessors of County of Nassau,* 70 Misc 2d 1077, affd 45 AD2d 821; *Matter of Ernst v Board of Assessors of City of Lockport,* 58 Misc 2d 504, affd 33 AD2d 655). It was permissible, therefore, for the board of assessors here to try to accomplish that by tempering its use of rental income with leasehold bonuses in amounts representing the differential between the actual rent and the market rent for each of the three stores in question" (emphasis supplied). While we do not indorse the *Nezelek* theory that a tax review petitioner must sustain his burden by clear and convincing evidence or that proof of value based upon the capitalization of actual income can be overcome only by clear and convincing evidence that actual income does not reflect the market (see *Caroldee Realty Corp. v Board of Assessors,* 73 Misc 2d 41, 44, *supra*), we do believe that actual income is a highly significant and excellent indicator of value. When, as here, a petitioner presents evidence of actual rental income based on a large number of leases in a single shopping center, which leases, when originally made, were bona fide and the fruit of arm's length negotiations, the taxing authority in the proceeding bears a heavy burden in demonstrating that the actual rents were not economic and were submarket.

### PETITIONER'S EVIDENCE

At bar, the petitioner certainly did not attempt to present an evidentiary examination (see *Matter of Merrick Holding Corp. v Board of Assessors,* 45 NY2d 538, *supra*), to establish that the actual rents were below market, and appellants' cross-examination of petitioner's witnesses clearly did not establish that the actual rents were not reflective of the market. Petitioner, however, went beyond merely setting forth the actuals and stabilizing them. Affirmative evidence was presented and is contained in the record demonstrating that the stabilized actuals were, in fact, reflective of the market. The following is a brief summary of that evidence, some of which was adduced at trial by the appellants themselves.

### I.

For the subject assessment years 1962 through 1976 and for the large number of tenants of the subject regional shopping center, petitioner's expert, Powers, presented actual income evidence of minimum rents, overage rents (percentage of gross receipts or sales), real estate tax contributions, common area maintenance and security charges, and miscellaneous income, plus actual expense evidence for the same period, place and tenants. Powers testified that all of the leases made between 1962 and 1977 were at market rents: "Q Are you also saying that leases that were made in '54 and '64 and '60 were also economic rent? A Yes, they were." Powers also testified: "Q What is your opinion about the management of the property since between [*sic*] 1969 and

1975? * * * A In my opinion the property was managed very well. It was managed by a professional managing agent namely Feist & Feist and the leases that were made were fair, arms length, open market transactions and they represented economic rent. Q The leases on the subject premises for that six-year period were equal to economic rent? A The ones that were made during that period and the ones that were in operation represented, in my opinion, economic rents. Q Wait, wait. Let's split that up. The leases that were made between 1969 and 1975 you say represented the times they were made, economic rent; is that correct? A Yes. * * * Q Well, were there any leases, according to your research and opinion, made between 1962 and 1977 that were not economic rent? A None, I found that they were all economic rent by virtue of the fact that they had within them all of the elements necessary, namely the minimum rent and a percentage rent so that the percentage more than covered the increase. Should there be an increase in the sales the landlord shared in that increase and the combination of the minimum and the percentage represented economic rent". Thus, the leases had escalation provisions built into them to account for and adjust for (1) increased business due to the value of the tenant location within the subject shopping center, (2) increased dollar sales volume due to inflation, and (3) provisions to recoup from the tenants real estate tax increases and maintenance expense increases (see *Matter of Merrick Holding Corp. v Board of Assessors,* 45 NY2d 538, 544-545, *supra*).

## II.

The report of petitioner's appraiser also contains evidence other than his expert opinion that the actuals were, in fact, reflective of the market. Thus, his report states: "In addition to the appraiser's experience with similar type commercial properties, he has utilized important and well documented information made available from the Urban Land Institute and their publication, *The Dollars and Cents of Shopping Centers.* These statistics have been very helpful in comparing the subject with similar properties." He used that publication as a statistical guide to lend some additional support to his conclusion that the actual rents, as stabilized and utilized by him, were reflective of the market (*Matter of Altman & Co. v City of White Plains,* 57 NY2d 904). The evidence also establishes that the subject shopping center is obsolete and at a competitive disadvantage because it does not have an enclosed mall. It also has poor topography, and, as noted by petitioner's appraiser, one of its "critical problems * * * is access".

## III.

The report of the city's appraiser, Greco, contains certain data that tend to support petitioner's claim that the subject's actuals are reflective of the market. Thus, petitioner's brief correctly asserts: "Mr. Greco included in his report the income and expense history at Roosevelt Field Shopping Center for the years 1970-1975. Mr. Greco selected this regional shopping center as reasonably similar to the subject and used the expense history of Roosevelt Field as a basis for his estimated expenses for the subject * * * Mr. Greco concluded that Roosevelt Field was a well-managed regional shopping center. A comparison of the income experience at Roosevelt Field with that of the subject demonstrates that the subject out-performed Roosevelt Field in every year but one. Keeping in mind Roosevelt Field is a newer, enclosed mall shopping center, this clearly demonstrates the stabilized actual rentals constitute the economic rent for the subject.

"COMPARISON OF TOTAL INCOME PER SQUARE FOOT OF
[GROSS LEASABLE AREA]

| CROSS COUNTY | | ROOSEVELT FIELD |
|---|---|---|
| 1970 | 2.83 | 2.05 |
| 1971 | 3.00 | 2.21 |
| 1972 | 2.98 | 2.74 |
| 1973 | 3.15 | 2.91 |
| 1974 | 2.93 | 3.23 |
| 1975 | 3.69 | 3.61 " |

Although the fact that leases were arm's length and prudent when made does not necessarily insure that over the years the original rents will remain prudent and reflective of the market (see *Matter of Merrick Holding Corp. v Board of Assessors,* 45 NY2d 538, *supra*), Greco's report and testimony contain certain other statements supportive of petitioner's claim that the actuals were reflective of the market. Thus, in contending that renewal and new leases made at the subject shopping center during the years under review and comparable leases made outside the center during those years indicate petitioner's actuals do not reflect the market, Greco's report stated: "The subject property is leased to various tenants under agreements which were made, for the most part, in the early 1950's when the subject center was originated. While some of the leases have been renewed or renegotiated in the latter years which are involved in this Appraisal at or near the fair economic rent, the majority of leases are based on rental values which may be [*sic*] represented economic rent at the time of their inception, but which obviously do not reflect the fair economic rent in subsequent years". Greco further testified to the effect that he used the renewal or new leases "as evidence of economic rental for the shopping center".

### APPELLANTS' EVIDENCE

We find that appellants' evidence failed to establish that the actual income was not reflective of the market for the years under review. At the trial the city relied upon the evidence of its appraiser, Roland R. Greco, and one Leonard Marx. Of Marx' testimony, the court concluded, after trial, as follows: "The testimony of Mr. Marks [*sic*] who was called by the [appellants] in an effort to prove mismanagement, based upon prior testimony he gave in other litigation concerning the subject shopping center likewise does not establish any mismanagement on the part of the owners. Mr. Marks [*sic*] indicated during his testimony that certain leases created administrative problems, not monetary problems and his testimony clearly established that actual renewals at the subject compared very favorably to Mark's [*sic*] projection of what he thought he could get if he was running the place". Although it is apparent that Marx was called to establish more than mismanagement, i.e., to also support appellants' contention, *inter alia,* that the subject's actual income was not reflective of the market, we. conclude that, on the whole, Special Term's opinion as to the worth of his testimony in prior litigation concerning the property was fully supported by the evidence. The court's posttrial decision rejected the testimony of Greco, *inter alia,* on the following grounds: "Mr. Greco, on the other hand, tried to assign a rental value to each particular space at the shopping center by relying upon numerous leases of space both within and without the subject property. In the Court's opinion, Mr. Greco totally failed to establish the rental value by this method since he testified repeatedly

on cross-examination and it is obvious from his appraisal reports in evidence that whereas he made certain adjustments to his numerous comparable leases, at no place in his appraisal report nor in his testimony did he set forth those adjustments or how he arrived at them. In his appraisal process, Mr. Greco ignored the concept of 'tenant mix'; he determined income based upon one year leases although he admitted that such was not common practice or 'good business judgment in any sense'; his comparable leases from properties outside the subject were not verified and were not related to the subject, nor were adjustments made between those leases and the subject, much less any location adjustment or adjustment for location within the shopping center which is clearly an important consideration for the type of shopping center under review". We are in accord. We note particularly that without precise dollar or percentage adjustments, an appraiser's bald opinions represent nothing but conclusory estimates and are entitled to no probative weight (*Ciuffini v State of New York,* 42 AD2d 1036; *Getty Oil Co. v State of New York,* 33 AD2d 705; *City of Buffalo v Clement Co.,* 41 AD2d 41). Accordingly,the judgment under review is affirmed insofar as appealed from. Damiani, J. P., Titone, Lazer and Gibbons, JJ., concur.