CRABTREE, J.T.C.
The municipality moves, in this local property tax case, for dismissal at the close of the taxpayer’s proofs on the ground that, upon the facts and the law, the taxpayer has shown no entitlement to- relief. While the motion was made pursuant to R. -4:37-2(b), the court, for the reasons hereafter stated, views the predicate of the motion to be the taxpayer’s failure to overcome the presumption of correctness of the assessments for the years 1987 through 1992.
The procedural 'history of the case is complex and requires extensive explanation.
On March 21, 1990 the municipality filed a complaint seeking relief under the correction of errors statute, N.J.S.A. 54:51A-7, with respect to the assessments made against the taxpayer’s property for the years 1987 (a revaluation year), 1988 and 1989. The error complained of arose from the transmission of assess *197 ment data from the revaluation firm’s computer to the Bergen County Board’s computer. All persons concerned with the assessment, namely, the revaluation firm, the municipal assessor, and the taxpayer’s representative, understood that the assessment would be $11,827,000. The assessment that appeared on the tax rolls, however, was $5,520,500.
The taxpayer filed an answer and counterclaim on April 4,1990. The answer was a general denial disputing the municipality’s entitlement to relief; the counterclaim simply asserted the taxpayer’s claim to an assessment reduction in the event the court granted the municipality the relief it sought.
After a trial, the court found that the error complained of did not constitute an error within the purview of the correction of errors statute and thus the municipality was denied relief. Following a motion for reconsideration the court reversed itself and held that the error in computer transmission was, in the context of modern computer technology, a mistake in assessment within the contemplation of N.J.S.A 54:51A-7. Relief was granted in a Memorandum Opinion of April 21,1992 and the appropriate order was thereafter entered.
While the taxpayer did not challenge the standing of the municipality to seek relief under the correction of errors statute, a comment about its standing is in order.
Judge Lario of this court held in Little Egg Harbor Tp. v. American Telephone & Telegraph Co., 9 N.J.Tax 314 (Tax 1987), aff'd o.b. per curiam, 10 N.J.Tax 236 (App.Div.1988), that the municipality had standing to seek relief under the correction of errors statute. In tracing the history of the correction of errors statute and the 1979 amendments thereto Judge Lario observed:
Prior to its amendment in 1979 N.J.S.A 54:2-41 (repealed), the correction of errors statute contained several shortcomings including a lack of a time limit within which the application was required to be made, and relief could only be granted upon consent of the municipality effected. Without this consent the property owner was without recourse regardless of the merits of his complaint. Additionally, neither the municipality nor the county board could initiate this proceeding; it could be accomplished only upon written complaint of the owner. In acknowledging the obvious inequity of denying relief to an admittedly deserving taxpayer who could *198 not receive the affirmative consent of the municipality, this statute was amended in 1979, L. 1977 c. 11 § 8 with the express purpose of eliminating this prerequisite; enlarging the class of persons entitled to apply; eliminating the time within which to apply; and to more specifically define the type of correction permitted____
As adopted this amendment grants the right of appeal not only to the “property owner” but also to “a municipality and a county board of taxation.” [9 N.J.Tax at 325.]
The taxpayer’s right of review has been preserved in this case by its timely answer and counterclaim.
The cases for tax years 1990, 1991 and 1992 are conventional direct appeals filed by the taxpayer.
Indubitably, the presumption of correctness attaches to the assessments for 1990, 1991 and 1992. It remains to be seen, however, if the presumption attaches to the 1987, 1988 and 1989 assessments as corrected pursuant to N.J.S.A. 54:51A-7, in view of the erroneous assessment inadvertently and mistakenly carried on the tax rolls prior to discovery of the error and the municipality’s action to correct it.
The presumption of validity attaches to the quantum of the assessment, irrespective of any deficiencies in the assessment methodology. Pantasote Co. v. Passaic City, 100 N.J. 408, 495 A.2d 1308 (1985). Thus, the appealing taxpayer has the burden of proving the assessment to be erroneous. Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 87 A.2d 425 (1952). The presumption of the taxing authority can be overcome only by evidence which is definite, positive and certain in quality and quantity. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952). As the Supreme Court stated in Pantasote:
It is dear that the presumption is not simply an evidentiary presumption serving only as a mechanism to allocate the burden of proof. It is, rather, a construct that expresses the view that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law____ [100 N.J. at 413, 495 A.2d 1308.]
See also 1530 Owners Corp. v. Fort Lee Boro., 135 N.J. 394, 404, 640 A.2d 811 (1994).
In this case the proofs at the trial of the correction of errors issue do not indicate the assessor’s use of any faulty methodology; *199 nor was there any indication that the assessor arbitrarily or capriciously exercised his authority. The original assessment was a result of what can only be described as a clerical mistake (in modern technological argot, a “glitch”); everyone involved knew what the assessment was intended to be.
In light of all these factors the court concludes that the presumption of correctness attaches to the corrected assessments for 1987, 1988 and 1989 as well as to the assessments for 1990, 1991 and 1992.
The specific predicate for the taxing district’s motion is the methodology employed by the taxpayer’s valuation expert in developing his estimate of true value of the subject property on the relevant valuation dates, viz., his failure to value the property as free and clear of all encumbrances.
The subject property is a Lord & Taylor department store located in the Fashion Center Mall, a regional shopping center in Paramus. Lord & Taylor is one of two anchor stores, the other being B. Altman & Co. An anchor store is defined as “[t]he major store within a shopping center that attracts or generates traffic for the facility, e.g., a major chain or department store in a regional shopping center.” Appraisal Institute, The Dictionary of Real Estate Appraisal 13 (2nd ed. 1989).
The Lord & Taylor store is separately assessed as Block 6101, Lot 2.
The Lord & Taylor store, prior to 1974, was owned by Associated Dry Goods Corporation (“Associated”) and operated by Adcor Realty Corporation (“Adcor”), a wholly-owned subsidiary of Associated. In October 1966, Associated, Adcor, and B. Altman & Company (“Altman”) entered into a series of agreements, one of which was an operating agreement whereby Associated and AIL man agreed to continue the operations of the Lord & Taylor and Altman anchor stores at the Fashion Center Mall for fifteen years. This agreement was amended on March 11, 1982, to include the taxpayer, which had purchased the Lord & Taylor store from *200 Associated in 1974 under a sale-leaseback transaction, and to extend the operating agreement to December 31, 1992.
In developing true value estimates for the Lord & Taylor store for tax years 1987 through 1992, the taxpayer’s valuation expert utilized all three approaches to value. Notwithstanding his use of all three approaches, the expert placed sole reliance upon the sales comparison approach, as his final “reconciled” value estimates were identical to the value estimates derived from the sales comparison approach. In arriving at his final conclusions of value for all years he testified that he considered the effect of the operating agreement and, moreover, that, in developing his value estimates under the sales comparison and income approaches, he utilized comparable sales and leases of properties also encumbered with operating agreements.[1] He stated that, because the compa-rables and the subject were all encumbered by reciprocal operating agreements, he made no adjustment for such agreements.
As a general rule, all interests in property must be valued for ad valorem tax purposes. In re Appeal of Neptune Tp., 86 N.J.Super. 492, 207 A.2d 330 (App.Div.1965); Secaucus v. Damsil, Inc., 120 N.J.Super. 470, 295 A.2d 8 (App.Div.1972); Tower West Ap’t Ass’n v. West New York, 2 N.J.Tax 565 (Tax 1981), aff'd per curiam, 5 N.J.Tax 478 (App.Div.1982). “The law requires an assessment of the value, not of the purported owner’s title, but of the land; the assessed value of the land represents the value of all interests in the land.” Stack v. Hoboken, 45 N.J.Super. 294, 300, 132 A.2d 314 (App.Div.1957).
While governmental restrictions may have an effect upon value, Schwam v. Cedar Grove Tp., 9 N.J.Tax 406 (Tax 1987), aff'd o.b. per curiam, 228 N.J.Super. 522, 550 A.2d 502 (App.Div.1988), certif. den. 115 N.J. 76, 556 A.2d 1219 (1989), private, contractually imposed restrictions do not. Glenwood Realty Co., Inc. v. East *201 Orange, 78 N.J.Super. 67, 187 A.2d 602 (App.Div.1963) (mortgage on property must be ignored). As Judge Lario stated in Lidell v. Mimosa Lakes Ass’n., 6 N.J.Tax 417 (Tax 1984): “[L]andlord and tenant interests, life tenant and remainder interests, co-tenant interests, mortgagor and mortgagee interests, and grantor and grantee interests (where less than a full fee is conveyed) are not separately assessed, instead the full value of the fee is assessed as though there were no separate interests.” 6 N.J.Tax at 425 (citations omitted).
The only exceptions are those instances where some elements of value in the property are transferred either to another property, as in the case of an easement appurtenant where the subject is the servient tenement, Ehren Realty Co. v. Magna Charta B. & L. Ass’n, 120 N.J.Eq. 136, 184 A. 203 (Chancery 1936); Lipman v. Shriver, 51 N.J.Super. 356, 144 A.2d 37 (Law Div.1958), or to the public at large, as in the case of an easement in gross, Englewood Cliffs v. Allison’s Estate, 69 N.J.Super. 514, 174 A.2d 631 (App. Div.1961) (park for the use of the public created by trust under a will).
The cases before the court involve restrictions imposed by private contract, i.e., the reciprocal operating agreement, as amended, which requires the anchor stores (Lord & Taylor and Altman) to remain in operation as department stores under their respective names for fifteen years or, under the March 11, 1982 amendment, until December 31, 1992.
It thus appears that the taxpayer’s expert has not valued the Lord & Taylor store as free and clear of all encumbrances; rather, by his own admission, he has taken the reciprocal operating agreement into account in valuing the property.
The taxpayer contends, however, that value has been transferred from the anchor stores to the satellite stores, citing New York Court of Appeals decisions in G.R.F., Inc. v. Board of Assessors of Nassau County, 41 N.Y.2d 512, 393 N.Y.S.2d 965, 362 N.E.2d 597 (N.Y.1977) and Penn Central Transportation Company v. City of New York, 42 N.Y.2d 324, 397 N.Y.S.2d 914, 366 N.E.2d 1271 (N.Y.1977), aff'd, 438 U.S. 104, 98 S.Ct. 2646, 57 *202 L.Ed.2d 631 (1978).[2] While, as indicated above, courts have recognized the concept of value transfer in tax valuation proceedings, taxpayer’s expert has not undertaken to quantify any such transfer from the Lord & Taylor store to the satellite stores in the Fashion Center Mall. The observations made by Judge Lasser in Mays Center Associates v. Rockaway Tp., 13 N.J.Tax 431 (Tax 1993) apply with equal force to the cases before this court. In that ease Judge Lasser found the true value of a separately assessed Lord & Taylor anchor store in the Rockaway Townsq-uare Mall to be $13,525,000, calculated under the cost approach, but, although recognizing the possibility of a transfer of value from the anchor stores (including Lord & Taylor) to the mall stores, he declined to reduce the cost-determined value, saying, at p. 444 of 13 N.J.Tax:
I have concluded the value of the subject to be $13,525,000. The amount of allocation of cost or value transferred to the remainder of the shopping center cannot be quantified because there is no evidence of either the assessments or the value of the mall stores, or the value of the mall stores and anchor stores together, or of the amount of value transferred. The entire shopping center is a single economic unit. Taxpayer attempts to value one segment of the entire center and then attribute a portion of that value to part or all of the remainder. I am unable to determine from the proof the allocation which must be made to reflect the value of the subject property which may have been transferred to the mall stores. (Citations omitted) Taxpayer’s appraisal expert’s value is subject and, thus, reduced by the operating agreement with the owner. There is no testimony of the dollar effect of the operating agreement on the value of the subject or the mall stores by taxpayer’s experts.
Moreover, even if one assumes a transfer of value from the anchor stores in the Fashion Center Mall to the core stores, the evidence does not indicate whether the value transferred is business value or real property value; nor, if the value transferred is the latter, how much came from the Lord & Taylor store, and how much from B. Altman & Co., the other anchor store. Furthermore, as indicated above, taxpayer’s expert has not undertaken to quantify any such transfer of value. See also Llewellyn Park v. *203 West Orange Tp., 224 N.J.Super. 342, 540 A.2d 868 (App.Div.1988) (value transfer from park to homeowners entitled to park use not quantified).
It is worthy of note that the taxpayer’s expert failed to consider the imminent termination of the operating agreement on December 31, 1992, just a little more than one year after the latest assessing date and a little more than six years after the earliest assessing date. The amended agreement setting the termination date at December 31, 1992 was in existence several years prior to the earliest assessing date.
Cases decided under R. 4:37-2(b), the analog to the presumption of correctness applicable in tax eases, indicate that where expert testimony is involved it is proper for the court to dismiss the complaint if the expert testimony either fails to establish what needs to be proven by the expert or is insufficient in establishing the necessary facts. See Hearon v. Burdette Tomlin Memorial Hosp., 213 N.J.Super. 98, 516 A.2d 628 (App. Div.1986); Wagner v. Deborah Heart and Lung Center, 247 N.J.Super. 72, 588 A.2d 860 (App.Div.1991). In this regard the court has the power to determine whether or not as a matter of law the expert’s testimony is both competent and sufficient. Fantini v. Alexander, 172 N.J.Super. 105, 410 A.2d 1190 (App.Div. 1980).
In light of the principles just stated, the court concludes that the taxpayer’s expert has failed to establish the true value of the subject property in that he has not taken into account all the interests therein, nor, to put it somewhat differently, has he valued the property free and clear of all nongovernmental encumbrances. The expert valued the property subject to an encumbrance, namely, the Operating Agreement and has relied upon comparable sales and leases of properties which were also subject to operating agreements. It is as though he valued a property subject to a mortgage and, to preserve comparability and avoid the need for adjustments, selected comparable properties which were also encumbered by mortgages.
*204 In selecting anchor store leases that he felt to be comparable for use in the development of his income approach, the expert assumed that anchor store rentals would be lower than rentals paid by non-anchor department stores because of a mall’s indispensable need for anchor stores and the assurance of their continuing presence through operating agreements.
The expert’s cost approach is also tainted in that he calculates depreciation under a capitalized rent loss approach, utilizing rentals derived from leases in other anchor department stores also encumbered by operating agreements.
It is important to observe at this juncture that the expert’s understanding of operating agreements in general, and the operating agreements governing the Fashion Center Mall anchor stores in particular, is critical to his approach. The actual provisions of the operating agreements are irrelevant. Finally, the expert failed to consider the imminent termination of the operating agreement governing the Fashion Center Mall anchor stores, the effect of which would be to free those stores from all use and other restrictions imposed by the agreement.
The shortcomings in the expert’s presentation are no less dramatic and no less flawed than if the expert had valued a parcel of waterfront property at a reduced amount because it was subject to a riparian claim in clear contradiction to Secaucus v. Damsil, Inc., supra, or had utilized submarket rents and ignored the leasehold estate those rents created in violation of the Supreme Court’s mandate to use economic rents as declared in New Brunswick v. State of New Jersey, Div. of Tax Appeals, 39 N.J. 537,189 A.2d 702 (1963).
Judgment will be entered granting the municipality’s motion to dismiss for the reasons stated in this opinion.

 To be precise, the expert testified on cross examination that he sought, for use as comparables, sales and rentals of department stores situated within regional and super-regional shopping centers, and that, by their very location, those stores were subject to reciprocal operating agreements.

 Taxpayer also cites another New York case, In re County Dollar Corp. v. City of Yonkers, 97 A.D.2d 469, 467 N.Y.S.2d 666 (1983), for the proposition that operating agreements affect value in malls. Nowhere in that lengthy, discursive opinion is there any reference to operating agreements or to the role of anchor stores. The whole case turned on the issue of economic rent.