135 N.J. Super. 26 (1975)
342 A.2d 560
HUMBLE OIL AND REFINING COMPANY, PETITIONER-RESPONDENT,
v.
BOROUGH OF ENGLEWOOD CLIFFS, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 3, 1975.
Decided July 2, 1975.
*27 Before Judges KOLOVSKY, LYNCH and ALLCORN.
Mr. Melvin Gittleman argued the cause for appellant (Messrs. Capone, Gittleman & Anastasi, attorneys).
Mr. Lawrence S. Berger argued the cause for respondent (Messrs. Lasser, Lasser, Sarokin and Hockman, attorneys; Mr. Jonathan A. Bernstein on the brief).
The opinion of the court was delivered by LYNCH, J.A.D.
Over two years ago, on June 4, 1973, this court remanded this matter (together with a companion case, Mobil Oil Corp. v. Englewood Cliffs, Docket A-498-72), to the Division of Tax Appeals (Division) for a new hearing and for the making of "adequate findings of fact and conclusions of law, together with an expression of reasons for the finding and conclusions." We specifically pointed to two areas to be considered in such findings and conclusions, namely:
(1) The land lease for 15,000 net a year from Nichols to Humble Oil and Refining Company (Humble), and
(2) The relevance and usefulness of the "gallonage" standard in valuing the subject property. As to the latter, we directed attention to the case of Aetna Life Insurance Co. v. Newark, 10 N.J. 99, 108-109 (1952).
We also called attention to Van Realty, Inc. v. City of Passaic, 117 N.J. Super. 425 (App. Div. 1971), and Parkview Village Ass'n. v. Collingswood, 62 N.J. 21 (1972), in the hope that the Division judge, after remand, would heed the guidelines there set out as to the nature of, and the necessity for, adequate findings and conclusions. See also *28 Benjamin Moore & Company v. Newark, 133 N.J. Super. 427 (App. Div. 1975).
After our remand further testimony was taken by the Division judge on August 29, 1973. A written opinion was subsequently rendered and a judgment entered on April 23, 1974. While we consider that the instructions in the cases cited and in our remanding opinion herein were clear and explicit, apparently they were not understood by the Division judge. His opinion after remand is totally lacking in adequate findings, conclusions and attendant reasons.
Tax litigation should not be prolonged and should be brought to an end with definiteness if possible. Aetna Life Ins. Co. v. Newark, supra, 10 N.J. at 103. This is so because of the necessity for some stability in municipal finances as well as similar interests of a taxpayer. Recognizing the abortive result of our prior remand with consequent delay, we feel compelled to assume the original jurisdiction which we may invoke under R. 2:10-5. Accordingly, we make our own findings and conclusions.
This appeal involves the 1969 and 1970 assessments on the property involved, a parcel of land of approximately 18,000 square feet which is used for a gasoline station and automobile repair facility. The property was assessed for those years as follows: land, $170,000; improvements, $26,300; total, $196,300. Neither party disputes the assessment of the improvements. Humble appealed to the Division which, after our remand, reduced the land assessment to $101,365. The borough appeals to this court.
The property was leased in 1964 for a 20-year term by its owner, Virginia Nichols, to Humble, for a net annual rental of $15,000, with all costs of maintenance, real estate taxes, etc., being borne by the lessee. The lease also granted Humble options to renew for four additional five-year terms and Humble was free to demolish the then existing service station building and to construct another in its place. This was accomplished in 1967. Humble, in turn, leased the property *29 (including land, building, tanks, pumps, signs, lights, compressor and lifts) to third-party service station dealers.
Taxpayer's expert, John Lasser, relied on what we shall call the "gallonage" approach in valuing the property. He took the average gallonage sold during the years 1964 through 1969 (700,000 gallons) and multiplied that by 1.8 cents a gallon (representing what in his opinion was the fair rental value paid by dealers to major oil companies) to attain a gross income figure of $12,600. A deduction for expenses and vacancy factor yielded a net income of $11,146. Because the value of the building ($26,300) was known and by assuming certain rates (7.5% interest, 4% depreciation, 1.8% real estate taxes), Lasser concluded that the net income attributable to the building was $3,498, so that the balance of net income ($7,648) was attributable to the land. By capitalizing the latter figure at 9.3% (7.5% interest plus 1.8% taxes), a value for the land of $82,200 was obtained, or a total valuation (land plus building) of $108,500. The expert reached the same result by what he calls the reproduction cost approach, by allocating $4.50 to each square foot of land.
Lasser expressly rejected the long-term ground lease at the annual net rate of $15,000, claiming that (a) such rent included compensation for the use of a "permit" to operate the gasoline station and thus did not accurately reflect the rental value of the land alone; (b) a constant rent over such a long period of time is not indicative of fair rental value, and (c) certain developments, allegedly anticipated in 1964 at the time the lease was signed (particularly the paving of adjacent Hollywood Avenue, a paper street, and an eventual 900,000-gallon annual sale volume) had not materialized so that the $15,000 ground rent was not economically sound during the period relevant to the instant tax appeals. i.e., for the tax years 1969 and 1970.
John Cattanach, the borough's expert, also considered the gallonage approach, though he used a figure of 2 1/2 cents a gallon as the "going market rental for a service station in *30 Englewood Cliffs." However, he supported the "economic rent" by the actual rental paid by Humble to the owner Nichols, namely, $15,000 a year net.
Although, as stated above, we do not have the benefit of the tax judge's reasoning in the instant case, his approach essentially parallels that of the taxpayer's expert in that he (1) totally rejected the $15,000 a year net ground lease as an indicium of value and (2) instead placed principal reliance upon the gallonage approach.
We are unable to accept the reasoning of the Division. First of all, it must be recognized that gallonage figures, depending as they do on the brand of gasoline sold, the skill and efficiency of the dealer, the advertising efforts made, etc., are more reflective of the business conducted on the property than on the market value of the real estate for assessment purposes. Indeed, it has been said that the volume of gasoline sold depends upon five major factors: price, management, brand, location and suitable improvements, only two of which are related to the value of the real estate. Brick, "Gasoline Service Station Appraising," in Friedman, Encyclopedia of Real Estate Appraising (rev. ed 1968), 849, 863-864. The gallonage approach, applied exclusively, is contrary to the philosophy expressed in Aetna Life Ins. Co. v. Newark, supra:
* * * the theory asserted is a formula based on sales volume and therefore is subject to the variables of goodwill and management practices which are factors entirely foreign to the true value of the real estate as such. For this reason the evidence adduced in this category was neither competent nor sufficient to establish the fair and full value of the property. [10 N.J. at 109]
We do not decide whether, under some circumstances, the gallonage approach might be a satisfactory method of valuing gasoline service station property. Here, however, we find, for the reasons stated below, that the net ground lease is the most persuasive factor in determining the value of this property.
*31 We start with the proposition that
The search, of course, is for the fair value of the property, the price a willing buyer would pay a willing seller. [New Brunswick v. Div. of Tax Appeals, 39 N.J. 537, 543 (1963)]
To that end, "rental income may be a relevant factor in reaching true value of real estate for tax assessment purposes." Aetna Life Ins. Co. v. Newark, supra, 10 N.J. at 106.
In McCrory Stores Corp. v. Asbury Park, 89 N.J. Super. 234 (App. Div. 1965), the taxpayer had introduced evidence of (1) the gross sales figures realized by the business conducted on the subject property during the tax years in question; (2) actual rent paid under a long-term fixed rental lease, and (3) rents paid for comparable commercial properties in the same location, along with income analysis of these figures. Both parties had also introduced calculations based on the cost approach to valuation. The Division relied exclusively on the gross sales data (with deductions for expenses) in utilizing the income approach to valuation. This court reversed, finding no basis for the Division's total reliance on gross sales data as a factor:
It is true, as the court said in New Brunswick, that in using the income approach "the fair rental value, rather than the actual rent payable under an existing lease, must control" (at p. 544), citing Somers v. City of Meriden, 119 Conn. 5, 174 A. 184, 186-187, 95 A.L.R. 434 (Sup. Ct. Err. 1934), annotated 95 A.L.R. 442 (1935); People ex rel. Gale v. Tax Comm'n of City of New York, 17 App. Div.2d 225, 233 N.Y.S. 2d 501, 506-507 (App. Div. 1962). But as the cited authorities clearly indicate, this does not mean that the actual rent is to be disregarded. On the contrary, in Somers v. City of Meriden, supra, the Connecticut court said:
"The trial court correctly held that in the situation here presented `in determining what is fair rental income, the actual rental income, while not controlling, is an element to be considered.'" (174 A., at p. 186)
"The fact that property is under lease is a relevant and, if for an extended term, an important consideration. Leases soon to expire or tenancies at will, involving possibilities of early vacancies or lowering of rents, or long-term leases at rentals inadequate when measured by prevailing standards tend to impair, and equally, *32 leases having a long term yet to run and reserving relatively high rents measurably appreciate present value." (Ibid., at p. 187)
In People ex rel. Gale v. Tax Comm'n of City of New York, supra, the court said:
"An outstanding lease may be a benefit or a detriment to the subject property, and thus its duration, covenants and the rental fixed are simply elements along with many other considerations used to arrive at the value of the property. The amount of rental fixed by a lease, even though negotiated at arm's length, could be very misleading, as to the true value of property, for it is well known that many rental contracts may be at excessive or inadequate rentals because of poor business judgment on the part of one party or another. Then, too, long term rental contracts may be made in boom times or in times of depression, so do not necessarily reflect true value on a change in times. And, as Mr. Justice Bergan, sitting in this court, has very appropriately said, "Assessments cannot be made to trail behind every turn in the fortunes of real property. There are times when property must bear a share of taxation proportionate to value even though it may then have no income, or an income inadequately focused to true value. There are times when the full measure of ephemeral surges of increased income should not be reflected in assessments in fairness to the owner.' (People ex rel. 379 Madison Ave. v. Boyland, 281 App. Div. 588, p. 590, 121 N.Y.S.2d 238, p. 241)
Of course, an outstanding bona fide lease and the rental income established thereby are matters to be considered in determining `the full value' of the whole property, land and improvements. Value arrived at by capitalization of the fair rental value is, in ordinary cases, the surest guide to a sound appraisal. In that connection, the actual rent realized is significant as an important factor in determining what the fair rental value is. * * * But when there is evidence that factors such as long-term leases made under distress or boom conditions affect the actual rent, the weight to be given to the actual rent must be discounted accordingly." (233 N.Y.S.2d, at p. 506)
But power to discount the weight to be given the actual rent would hardly seem to justify disregarding it completely in this case and adopting a rental value computed by a formula based on sales volume which is "subject to the variables of good will and management practices." If anything, the inability of the Division to determine the fair rental value from a consideration of the McCrory rental and the rentals being paid for other commercial property in the area suggests that it should have adopted some recognized approach to value other than the income approach. [at 243-244]
*33 And in Parkview Village Ass'n v. Collingswood, supra, the Supreme Court, after citing McCrory for the proposition that "actual income is a significant probative factor in the inquiry as to economic income" (62 N.J. at 30), went on to state:
In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation. * * * Readily to be distinguished is the case of a taxpayer owning commercial property tied to a long term lease made long before the current assessing date, where the present rent may well be out of line with current fair rental value. See New Brunswick, supra (39 N.J. at 544). [62 N.J. at 34-35]
In the instant case we are of course confronted with a long-term lease. However, we find insufficient credible evidence in the record to support the taxpayer's contention that the 1964 contract rent for the ground lease is out of line with the fair rental value during the tax years in question, so that the ground lease should be disregarded. Moreover, even if such a disparity were shown, we are convinced that the ground lease is nevertheless highly relevant since, realistically, the purchase price paid by a prospective buyer for the subject property would be strongly determined by the existing lease provisions. The instant ground lease is "a long-term lease to a triple-A tenant at a high rental" which would indeed "make the property more attractive to a buyer." New Brunswick, supra, 39 N.J. at 544. The ground lease assures a prospective purchaser of a specified return over the balance of the 20-year term, with the possibility that Humble would exercise its options to renew for the extra five-year terms. With the original lease having approximately 15 years remaining after the assessment dates here involved, we find that the net lease provisions far outweigh any possible influence of the "gallonage" factor in determining the value of the property. We are thus in accord with the suggestion by Brick in the article cited above that "[t]he data to be gathered by the appraiser and to be used in the Income Approach *34 to value should consist of rentals which oil companies are paying to owners, and not amounts paid [to the oil companies] by dealers for operating rights." Encyclopedia of Real Estate Appraising, supra at 864.
We have noted that one of the reasons why Lasser, the taxpayer's expert, rejected the ground lease as a factor in his appraisal was that the rent contemplated use of the "permit" to operate a gasoline station on the site, and that the value of such permit should not be included in the assessed value of the real property. But see the Brick article, supra at 857: "[I]n appraising a gasoline service station site, the value of the permit must be taken into account." We need only note Lasser's concession here that the five gasoline stations in the borough have a "monopoly" in that no new stations can come into town unless a variance is obtained. The subject property can be operated as a gasoline station only by virtue of a valid nonconforming use. In our opinion the existence of such nonconforming use, rather than the permit itself, is a "condition" of the subject real property which must be considered in assessing such property. See Aetna Life Ins. Co. v. Newark, supra, 10 N.J. at 110.
Thus we conclude that the Division erred in capitalizing income based on gallonage volume and disregarding net income to the fee owner under the long-term ground lease. We follow the suggestion of Brick, supra, and find that "capitalization of net income should be based on rent data and not on gallonage volume." Op. Cit. at 880. We accept the capitalization rate of 7.5% as used by taxpayer's expert (insofar as he applied that figure to the interest phase of his capitalization process). Capitalizing the $15,000 rental at that rate would result in a value of $200,000 for the land.[1] Since this exceeds *35 the land assessment of $170,000, we conclude that the record does not justify reduction of that assessment.[2]
Accordingly, the judgment of the Division of Tax Appeals is reversed and the assessment affirmed.
NOTES
[1] This approach is not inconsistent with the holding in New Brunswick, supra, that "[t]he capitalization rate, including a factor for taxes, must be applied to net income before taxes." (39 N.J. at 547; emphasis supplied). That holding is applicable only where no reliable estimate of true net income is obtainable without first subtracting taxes from gross income (or from gross income less other expenses). Here, since the lessee is responsible under the lease for all taxes and expenses, the $15,000 annual rent payable to the lessor truly represents net income to the fee owner.
[2] As noted above, Lasser purported to rely also on the reproduction cost approach to valuation by allocating $4.50 to each square foot of land. Since there is no factual basis in the record to support his opinion in that respect, we rest our own findings solely on the evidence relevant to the income approach to valuation.