LASSER, P. J. T. C.
J. C. T. Associates contests local property tax assessments on its modern, single-tenant office building in Boonton, known as Block 69, Lot 72. The assessments in issue are:
1977 Added Assessment
Improvements $3,350,000 prorated for two months to
$558,333
(The 1977 regular assessment was $333,000 for land only).
1978 and 1979 assessments
Land $ 416,500
Improvements 3,350,000
$3,766,500 Total
*286 1980 assessment
Land $ 415,500
Improvements 3,350,000
Total $3,765,500
The 1977 added assessment and the 1978 assessment were affirmed by the Morris County Board of Taxation. The 1979 and 1980 assessments are the subject of direct appeals to the Tax Court pursuant to NJ.S.A. 54:3-21.
The subject property consists of a 16.66-aere parcel of land on Wooton Street, improved with a three-level building completed in 1977. The property is leased to Drew Chemical Corporation and used by it as its corporate headquarters. The building is steel-framed masonry with concrete slab flooring. It has electric heating and air conditioning and contains a lobby, open office areas, private offices, conference rooms and a cafeteria. The building has no sprinkler system. Approximately 10% of the interior is unfinished and reserved for future expansion. All utilities are available to the property. The property is landscaped and improved with an asphalt parking area.
The parties have stipulated that:
1. For 1977, the ratio of assessment to be applied is 63.05% and for 1978-1980 the provisions of Chapter 123 of the Laws of 1973 shall be applicable.
2. The building contains 102,500 square feet of gross floor area.
3. The 1977 added assessment proration of two months is not contested.
The 16.66 acre parcel was sold by Drew Chemical Corporation to J. C. T. Associates for $200,000 in 1976. This sale was part of a transaction in which J. C. T. was to have the building constructed and leased back to Drew for a 25-year period at an annual net rental which, for 1978 and 1979, was $708,180. The documents of the transaction were not submitted in evidence.
The appraisal expert for J. C. T. valued the property at $5,200,000 for the period October 1, 1977 to October 1, 1979. The appraisal expert for the taxing district valued the property *287 for this period at $7,000,000. In arriving at their opinions of value, both experts relied on the cost and income approaches to value. The expert for the taxing district also utilized the market approach. A summary of the cost and income valuation methods used by the appraisers follows:
J.C.T. Associates Boonton
Cost approach
Land value $ 240,000 ($14,500/acre) $ 800,000 ($50,000/aere)
Improvements value
Cost 5,158,808 6,662,500 (102,500 sq. ft. at $65/sq. ft.)
Depreciation - 515,881 (10%) - 199,875 (3%)
Net 4,642,927 6,462,625
Site improvements 500,000 (Included above)
Total value $5,382,927 $7,262,625
Income Approach
Income $ 709,293 $ 700,000
Real estate tax + 191,600 (Actual Average Not Added 1978-1980)
Vacancy - 21,279 (3%) Not Deducted
Management and accounting 3,000 Not Deducted
Net income 876,614 700,000
Income to land 34,800 ($240,000 x 14.5) Not Separated
Income to improvements 841,814 Not Separated
Capitalized at .17 .10
Value of improvements 4,951,847 6,200,000
Value of land 240,000 800,000
Total value $5,191,847 $7,000,000
The two appraisers agreed that the highest and best use of the property is as an office complex, and that the net rental value as of October first of 1977, 1978 and 1979 was $7 a square *288 foot. They differed substantially on all other appraisal elements.
The J. C. T. appraiser established a land value for both the cost and income approaches by increasing the $200,000 sale price of the land by 20% to adjust for the change in value occurring between 1976 when sold, and 1978, the average year between 1977 and 1979. Without further evidence of the transaction or support from other land sales in the area, the land sale price portion of the sale and leaseback transaction cannot be accepted as a bona fide arms length sale. Nonmarket considerations, such as income tax objectives, may play a part in sale leaseback transactions. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), 468; see Rek Investment Co. v. Newark, 80 N.J.Super. 552, 559, 194 A.2d 368 (App.Div.1963); Bloomfield v. Parkway Industrial Center, 3 N.J. Tax 220, 227 (Tax Ct.1981).
The Boonton appraiser valued the land based on nine office building land sales in Morris County, ranging from $40,-000 to $145,000 an acre. Each of these sales was analyzed and adjusted for time of sale, location and physical conditions. All of the sales were of land with locations superior to the subject property. Sale number nine at $40,000 an acre most closely resembled the subject property. In his analysis of this sale the appraiser deducted 9% to adjust for time and location of the subject property but added 25% for physical conditions because sale, number nine did not have adequate parking. Based on this analysis, the subject property would have a value of $46,000 an acre (rounded).
I have considered all nine sales as indicative of office building land values in the area but have concluded that the value of the subject land is best determined by the analysis of sale number nine. I find the value of the subject land to be $46,000 an acre, or a total of $766,360, rounded to $766,500.
J. C. T.’s appraiser valued the building, including site improvements, by the cost approach at $5,658,808 before depreciation, compared to the Boonton appraiser’s figure of $6,662,500. J. C. *289 T.’s appraiser relied in part on figures shown on the November 1, 1977 mortgage payment application furnished him by the owner. These figures showed a cost of approximately $5,000,-000, including a tenant’s allowance of $775,000 for finishing of the interior. No evidence was presented of the extent or actual cost of the improvements completed by the tenant. J. C. T.’s appraiser did not know the name of the general contractor or whether builder’s profit was included in the cost figures furnished by the owner. I conclude that the owner’s cost figures must be disregarded as incomplete.
The cost approach conclusions of both appraisers are less convincing than their income or market approach conclusions. The cost conclusions of J. C. T.’s appraiser were based on 1954 cost figures updated to 1977-1979 by a cost conversion factor of 3.5. If the cost conversion factor were accurate, there would be no reason to take 10% depreciation because the cost conclusion is the 1977-1979 average and the building is new. The Boonton appraiser based his cost estimates on a $65 a square foot figure, which figure was unsupported by other testimony.
The J. C. T. appraiser did not use the market approach because of a “lack of large office building sales in the Morris County area.” The Boonton appraiser used the market approach to develop a sale price per square foot and a capitalization rate for the income approach based on an analysis of the sales of seven office buildings in Morris, Union and Passaic Counties. The office buildings, ranging in size from 33,210 to 281,830 square feet, sold for an average price of $65 to $70 a square foot, and a net price amounting to 8.3% to 9.8% of the annual net income.
The income approach is the most reliable approach, for the subject commercial, income-producing property. Dworman v. Tinton Falls, 1 N.J. Tax 445, 452 (Tax Ct.1980), aff’d 180 N.J.Super. 366, 434 A.2d 1134, 3 N.J. Tax 1 (App.Div.1981), certif. den. 88 N.J. 495, 443 A.2d 709 (1982). Although the use of a gross rental value was found in New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A.2d 702 (1963) to be the prefera *290 ble means of comparing rentals using a meaningful common denominator, the use of net rentals for comparison was also approved in Humble Oil Co. v. Englewood Cliffs, 135 N.J.Super. 26, 342 A.2d 560 (App.Div.1975), aff’d 71 N.J. 401, 365 A.2d 929 (1976).
We accept the annual net rental value of $7 a square foot as the fair market rental and as the starting point for the income approach. In this case there is a net rental which is agreed to be the market rental value. No purpose is served by adding actual taxes and including an effective tax rate factor in the capitalization rate when the agreed market rental value is net after taxes. The net rental may be capitalized without a tax factor to arrive at the market value.
The $7 annual net rental a square foot, if multiplied by the stipulated 102,500 square feet of gross area, yields a total annual net rental of $717,500. However, the J. C. T. and Boonton appraisers used $709,293 and $700,000, respectively. I find that a net annual rental of $700,000 is the fair market rental value for the subject property, including an allowance for vacancy reserve and management and accounting expense, and taking into consideration the unfinished area. Therefore, there should be no additional deduction for these items.
The most significant divergence between the appraisers is the capitalization rate to be applied to the net rental income. The J. C. T. appraiser used capitalization rates of 11.68% for land and 14.18% for improvements (not including a real estate tax factor) compared to the overall 10% rate for land and buildings used by the Boonton appraiser. The capitalization rate used by the J. C. T. appraiser was calculated as follows:
.0718 Mortgage 70% at .1025
.045 Equity 30% at .15
Capitalization rate - land .1168 (not including) tax factor)
*291 Recapture - 40-year life .025
Capitalization rate - improvements . 1418 (not including) tax factor)
 Real property valuation is not a mathematical exercise but an effort to reflect activities of buyers and sellers who make the market. Unlike the New York Stock Exchange, the real property market is not a precise market. Discernment of market value thus requires consideration of all available factors. Although the income approach is the most appropriate, the cost approach and the market approach cannot be rejected. To the extent that they provide reliable information, they should be used to assist in developing the income approach. An analysis of the sales of seven office buildings in the area (the office building sales study) leads to the conclusion that the taxpayer’s capitalization rate is excessive.
The extraction of a capitalization rate from sales of comparable property is a recognized appraisal method. In their textbook entitled The Appraisal of Real Estate (7 ed. 1978) the American Institute of Real Estate Appraisers comments on extracting capitalization rates from market data:
The appropriate rates to employ in an appraisal of market value are rates that reflect market action. Investors may rationalize investment decisions in diverse ways, but their collective action creates the market. Accordingly, the appraiser makes use of market data to extract current rates and to identify trends that may be reflected in future market changes, [at 373]
Because of the unique nature of real property, identical comparable sales do not occur in the market. Sales of similar properties which provide reliable information may be utilized to derive a capitalization rate. From the evidence presented, the court is convinced that buyers and sellers in the market for newly-constructed office buildings in the area are paying and accepting a return of less than that testified to by the J. C. T. appraiser. Although the comparability of these sales for the purpose of deriving a capitalization rate has been questioned by the representative for the taxpayer, the trend that they represent cannot be ignored.
*292 I conclude that it is appropriate to use an overall capitalization rate in this ease. The seven comparable sales analyzed in the office building sales study indicated overall capitalization rates of between 8.3% and 9.8%. The appraiser for the taxing district concluded from his study that an overall capitalization rate of 10% is appropriate. This conclusion is supported by the American Council of Life Insurance Study of Interest and Capitalization Rates which reports an average capitalization rate for office buildings of 10.1% for the fourth quarter of 1978 (the mid-point in the period 1977-1980). Further support for this conclusion can be found in the Boonton appraiser’s office building sales study which indicates that the office buildings included in the study sold for $65 to $70 a square foot. A 10% overall capitalization rate results in a valuation of $7,000,000 for the subject property, a value within the $65 to $70 a square foot range. I conclude that an appropriate overall capitalization rate for the subject property is 10%.
Based on the foregoing I find the market value of the subject property to be:
Net income to be capitalized $ 700,000
Capitalized at .10 7,000,000
Allocated to land- 766,500
Allocated to Improvements 6,233,500
Total $7,000,000
This determination of value requires the following assessments:

1977 Added Assessment

The total 1977 added assessment when added to the 1977 regular assessment totals $3,683,000. The applicable ratio for 1977 is 63.05%, indicating a proper total assessment of $4,413,500 ($7,000,000 X 63.05%) before proration. The taxing district has not sought to increase the 1977 added assessment and, therefore, the 1977 added assessment of $3,350,000, prorated for two months to $558,333, is affirmed. See Matawan v. Tree Haven Apts., Inc., 108 N.J.Super. 111, 260 A.2d 235 (App.Div.1969).

*293
1978 Assessment

The chapter 123 average ratio for 1978 is 54%. The upper limit is 63% and the lower limit is 46%. The 1978 assessment of $3,766,500 is within the common level range of $4,410,000 ($7,000,000 X .63) - $3,220,000 ($7,000,000 X .46). Therefore, the assessment is affirmed.

1979 Assessment

The chapter 123 average ratio for 1979 is 60%. The upper limit is 69% and the lower limit is 51%. The 1979 assessment of $3,766,500 is within the common level range of $4,830,000 ($7,000,000 X .69) - $3,570,000 ($7,000,000 X .51). Therefore, the assessment is affirmed.

1980 Assessment

The chapter 123 average ratio for 1980 is 52%. The upper limit is 60% and the lower limit is 44%. The 1980 assessment of $3,765,500 is within the common level range of $4,200,000 ($7,000,000 X .60)-$3,080,000 ($7,000,000 X .44). Therefore, the assessment is affirmed.
The Clerk of the Tax Court is directed to enter judgment affirming the 1977 added assessment and the 1978, 1979 and 1980 assessments in accordance with the foregoing.