CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks direct review of the 1991, 1992 and 1993 assessments on its property located at 112 Eisenhower Parkway, Livingston, New Jersey (Block 290, Lot 5). The assessments, the same for all years, were:
*508 Land $5,364,000
Improvements 40,947,100
Total $46,311,100
The subject of the controversy is a super-regional mall[1] containing a gross building area of 1,144,723 square feet. The building is divided into the following components:
R.H. Mac/s (anchor store)[2] 255,061 sq. ft.
Sears (anchor store) 191,921 sq. ft.
Lord & Taylor (anchor store) 169,140 sq. ft.
130+ mall retail stores 375,221 sq. ft.
Kiosks 3,380 sq. ft.
Common area 150,000 sq. ft.
The anchor stores are all owner-occupied, except that plaintiff owns the land and leases it to the anchor stores.
The mall building is situated on 59.6 acres of land.
The entire land area, except for the area occupied by the mall building, is a parking area with 5,499 parking spaces. In addition, the mall enjoys an easement over 9.54 acres owned by Public Service Electric and Gas (PSE & G). This acreage lies between the mall land and Eisenhower Parkway. The easement provides for ingress and egress from the highway; it also provides additional parking, driveways, lighting, telephone conduits, a storm and sewer drainage system, and public utility lines for water, sewer, gas, electric and telephone lines. The mall could not function without the easement.
*509 The mall area occupied by the Lord & Taylor anchor store was previously occupied by a Hahne’s anchor store. The latter closed its doors in 1989, and the area theretofore occupied by Hahne’s was closed while renovations were made to permit occupancy by Lord & Taylor. This renovation continued throughout 1989.
Extensive renovations were also made to the mall in 1991.
There are thirteen kiosks, eight of them permanent, five seasonal. All kiosks are on rollers. They occupy space in the middle of the mall concourse during business hours; at the close of each business day they are rolled into secure storage areas. The kiosk operators pay rent to the mall owner for the kiosks and for the space in the mall concourse which the kiosks occupy.
The mall was built in 1971 or 1972, and, as indicated above, it was substantially renovated in 1989 and 1991. Some of the mall store tenants were in continuous occupancy from the inception of the mall up to and including the valuation dates for the years under review.
At all times pertinent hereto, occupancy of the retail mall stores was governed by overage leases, which called for a minimum rent, with additional rent payable as a percentage of sales in excess of a stated sales volume.
The highest and best use of the subject property is a continuation of its present use as a super-regional mall.
Plaintiffs expert estimated the true value of the subject property to be $92,350,000, for all years under review. In arriving at this estimate he utilized the cost and income approaches to value, placing primary reliance upon the latter. His cost approach produced a value estimate of $90,951,800, developed in the following manner:
Land 60 acres @$325,000/acre $19,500,000
Improvements
R.H. Macy 255,060 sf @$60/sf $15,303,360
Entrepreneurial Profit 10% 1,530,360
Total $16,833,960
*510 Depreciation 20% 3,366,792
Net $13,467,168 say $13,467,200
191.921 sf @$55/sf $10,555,655
Entrepreneurial Profit 10% 1,055,565
Total $11,611,220
Depreciation 20% 2,322,244
Net $ 9,288,976 say $ 9,289,000
Lord & Taylor
169.921 sf@$55/sf $11,163,636
Entrepreneurial Profit 10% 1,116,363
Total $12,279,999
Depreciation 10% $ 1,227,999
Net $11,052,000 say $11,052,000
Mall 528,572 sf@$65/sf $34,357,180
Entrepreneurial Profit 10% 3,435,718
Total $37,792,898-
Depreciation 10% $ 3,779,289
Net $34,013,608 say $34,013,600
Site Improvements 5,500 spaces @$750/space (Equiv. to $2.06/sf for 2,000,000 sf) $ 4,125,000
Entrepreneurial Profit 10% 412,500
Total $ 4,537,500
Depreciation 20% $ 1,907,500
Net $ 3,630,000 say $ 3,360,000
Total Value under cost approach $90,951,800
The expert claimed that there were no comparable vacant land sales, so he used the equalized value of the land assessment as the land value under the cost approach.
In developing the value estimate for the improvements, he referred to the computerized Marshall Valuation Service. He did not rely upon the Marshall book. He selected a building classification of Class C for all the improvements. He chose different cost ranks for the components: 3.5 Above Average/High for the *511 mall area (stores and concourse), 2.5 Average/Above Average for Macy’s, 2.0 Average for Sears and 3.0 Above Average for Lord & Taylor. He selected an observed condition of Good for all components. He selected only one valuation date (October 1, 1991). In addition to the selections of building classification, cost rank and observed physical condition, the expert supplied the Marshall computer with all relevant data including size, height, sprinklers, elevators and geographic location. The computerized Marshall service then calculated the unit cost for each component. Such cost, according to Section 1, page 4 of the Marshall Valuation Service (the book manual) included architect’s and engineer’s fees, construction period interest, sales taxes on materials, site preparation, utilities from structure to lot line and contractor’s overhead and profit. These computer-generated calculations resulted in the
following costs per square foot:
Mall stores and concourse $64.66
Macy’s $58.82
Sear’s $53.42
Lord & Taylor $65.43
In estimating depreciation, the expert assumed a 50-year life for the mall and assigned an effective age of 10 years to Macy’s and Sears, resulting in accrued depreciation of 20% for those two anchors. Because of the renovations made in the mall and in the Lord & Taylor store, the expert posited accrued depreciation of 10% for those components.
The expert offered no support for his site improvement estimates except to observe that the cost data came from Marshall.
The expert attributed no value to plaintiffs easement over land owned by PSE & G; nor did he take into account the cost-based value of tenant improvements.
The expert’s income approach can be summarized in tabular form as follows:
Mall Stores $ 5,500,000
Less 10% landlord contingencies 550,000
Total $ 4,950,000
*512 Kiosks
8 @$l,300/month $ 124,800
5 @$ll,000/season 55,000
' Total $ 179,800
Less 30% landlord expenses $ 53,940
Total $ 125,860
Anchor Stores
616,128 @$6.00/sf $ 3,696,768
Total net income $ 8,772,628
$8,772,628 capitalized @9.5%
$92,343,452 SAY $92,350,000
The expert relied upon the contract rents from all leases of mall stores as economic rent, even though many of the leases were executed as long ago as 1971 and 1972.[3] He purported to verify his conclusions in this regard by calculating the percentage rent applicable to each lease, applying the percentage to the entire sales volume and not just to the overage. He did not posit a vacancy and loss allowance but merely indicated the total square feet of vacant space, pointing out that, on the valuation dates for the- first two years, the vacant space amounted to approximately 6% of the total leasable area of the mall stores.
He claimed that the rents as a percentage of sales supported his conclusion that contract rents were economic rents and that the age of the leases did not matter, as the contract percentage level was the same in 1971-1972 as it was on the valuation dates.
The expert submitted no lease data for tax year 1993.
Relying on percentage rent provisions contained in leases for Mac/s store in Paramus, a Stern’s store in Jersey City’s Newport Center Mall, and a survey of some 45 anchor department stores *513 nationwide, plaintiffs expert posited economic rent for Macjfs and Sears at 2.5% of gross sales and 3.5% for Lord & Taylor. Utilizing information in his possession concerning the annual sales volume of those anchors, he projected economic rents of $5.68 per square foot for Macy’s, $4.10 per square foot for Sears and $5.79 per square foot for Lord & Taylor. He then converted these rentals to a uniform $6.00 per square foot for all three anchor stores.
Plaintiffs expert made no allowance for common area maintenance charges (CAM) paid by the mall tenants, nor did he consider what the leases termed “administrative charges” payable by the mall tenants. Similarly, his gross income projections did not include the cost of tenant fit-ups paid by the tenants.
Finally, the expert developed his capitalization rate by means of the band of investment/mortgage-equity method, positing a 70% mortgage @9.5% interest and a 25-year payout schedule, producing a 10.48% constant and a weighted mortgage component of 7.34%. He assumed a 30% equity dividend position at 7% and a weighted equity component of 2.1%. These calculations resulted in a total capitalization rate of 9.44%, which he rounded to 9.5% for all years under review. He purportedly considered a host of economic indicators and the allegedly large number of tenant failures, including the bankruptcy of R.H. Macy, in arriving at the assumptions implicit in his capitalization rate.
Defendant’s expert estimated the true value of the subject property to be $165,040,000 on October 1,1990 (for tax year 1991), $168,543,000 on October 1, 1991 (for tax year 1992) and $174,488,-000 on October 1, 1992 (for tax year 1993). In arriving at these conclusions he utilized both the cost and income approaches to value, placing primary reliance upon the latter, except for the anchors, in which connection the cost approach predominated. His final conclusions of value were thus derived from a hybrid approach, which raises an interesting issue to be addressed at some length hereafter.
The expert estimated the land value under the cost approach to be $500,000 per acre for tax year 1991 and $450,000 per acre for *514 tax years 1992 and 1993. To these estimates he added the value of transferred parking and access rights attributable to the easement over land owned by PSE & G. He estimated the transferred value to be 50% of the land value ascribed to the 59.6 acres owned by plaintiff. Thus, his total land value came to $32,185,000 for tax year 1991 and $28,966,500 for tax years 1992 and 1993, composed as follows:
October 1,1990
59.6 acres @$500,000/acre $29,800,000
plus 9.54 acres @$500,000/acre x 50% $ 2,385,000
Total tract value $32,185,000
October 1,1991 and October 1,1992
59.6 acres @$450,000/acre $26,820,000
plus 9.54 acres @$450,000/acre x 50% $ 2,146,500
Total tract value $28,966,500
The expert valued the 59.6 acres owned by plaintiff on the basis of six sales of vacant land, of which four parcels were in Livingston, one parcel was in Roseland and one parcel was in East Hanover. These sales took place between July 29, 1988 and June 30, 1993. They ranged from $339,622 to $669,776 per acre. The size of the properties involved ranged from 0.36 acres to 5.24 acres for five of the six sales. The sixth parcel, located in East Hanover, contained 26.91 acres.
The expert ascribed the same value to the PSE & G acreage, namely, $500,000 per acre for tax year 1991, and $450,000 per acre for tax years 1992 and 1993. He concluded that the easement benefiting the mall was worth 50% of the fee simple value of the servient tenement.
In developing a value estimate under the cost approach, defendant’s expert, like his opposite number, utilized the Marshall Valuation computer service, providing the same input as plaintiffs expert, except for building classification and cost rank. In this connection, the expert described the building class for the mall stores, the concourse and the anchors for all years under review as “Fireproof Steel Frame,” a description which corresponds to the
*515 Marshall Class A. He selected a cost rank, for all years, of High for Mac/s, Above Average/High for Sears, High for Lord & Taylor, and Very High for the mall. On the basis of the expert’s input, the Marshall computer produced the following calculations:
10/1/90 10/1/91 10/1/92
Mac/s $25,154,116 $25,365,816 $25,819,824
Sears $17,602,996 $17,752,692 $18,071,280
L&T $17,057,768 $17,204,920 $17,514,448
Mall $70,380,000 $70,690,000 $71,350,000
The costs shown for the anchors include heating and cooling, elevators and sprinklers. The costs shown for the mall include, in addition to the heating and cooling, elevators and sprinklers, costs for the mall concourse and common areas ($14,250,000 for all years), tenant leasehold fit-ups ($18,975,000 for all years), and kiosks ($490,000 for all years). These additional costs total $33,-715,000.
The expert added entrepreneurial profit of 10% and entrepreneurial overhead of 10%. He also estimated accrued depreciation based on effective age.
The expert’s final values, developed under the cost approach, are as follows:
10/1/90 10/1/91 10/1/92
Mac/s 25,154,000 $ 25,365,000 $ 25,819,000
Ent. OH 2,515,400 $ 2,536,500 $ 2,581,900
Profit 2,766,940 $ 2,790,150 $ 2,840,090
Depreciation 9% 10% 11%
Dep. Value 27,697,069 $ 27,622,485 $ 27,804,481
Sears 17,602,000 $ 17,752,000 $ 18,071,000
Ent. OH 1,760,200 $ 1,775,200 $ 1,807,100
Profit 1,936,220 $ 1,952,720 $ 1,987,810
Depreciation 11% 12% 13%
Dep. Value 18,955,594 $ 18,902,330 $ 19,023,342
L&T 17,057,000 $ 17,204,000 $ 17,514,000
Ent. OH 1,705,700 $ 1,720,400 $ 1,751,400
Profit 1,876,270 $ 1,892,440 $ 1,936,540
Depreciation 4% 4% 5%
Dep. Value 19,813,411 $ 19,984,166 $ 20,132,343
*516 MaU $ 70,380,000 $ 70,690,000 $ 71,350,000
Site Parking $ 5,000,000 $ 5,000,000 $ 5,000,000
Ent. OH $ 7,538,000 $ 7,569,000 $ 7,635,000
Profit $ 8,291,800 $ 8,325,900 $ 8,398,500
Depreciation 8% 9% 10%
Dep. Value $ 83,913,016 $ 83,342,259 $ 83,145,150
All Improvements $150,379,090 $149,851,240 $150,105,316
Land $ 32,185,000 $ 28,966,500 $ 28,966,500
Total $182,564,090 $178,817,740 $179,071,816
Rounded $182,565,000 $178,820,000 $179,070,000
In estimating the economic rent for the mall stores[4], the expert relied upon contract rents under 31 mall store leases executed between 1989 and 1994. In this connection, he utilized only the minimum guaranteed rents, ignoring the overages, ie., the additional rent based upon a percentage of sales in excess of a specified sales volume. In arriving at his economic rent estimates, he added $2 to $3 per square foot to reflect tenant fit-ups paid by the tenants.
In developing his economic rent estimates, the expert divided the stores into five groups according to size and assigned an economic rent to each group in the following manner:
Tax Year 1991
Units
Under 1,000 sf 15,709 sf @$50/sf $ 785,450
1.000 to 2,999 sf 114,606 sf @$33/sf $ 3,781,998
3.000 to 4,999 sf 88,922 sf @$30/sf $ 2,667,660
5.000 to 9,999 sf 62,893 sf @$19/sf $ 1,194,670
Over 10,000 sf 93,091 sf @$16/sf $ 1,489,456
TOTAL MALL STORES 375,221 sf($26.44/sfavrg.) $ 9,919,234
*517 Kiosks 3,380 sf @$100/sf $ 338,000
TOTAL RENTAL INCOME $10,257,243
Tax year 1992
Units
Under 1,000 sf 15,709 sf @$52/sf $ 816,868
1.000 to 2,999 sf 114,606 sf @$34/sf $ 3,896,604
3.000 to 4,999 sf 88,922 sf @$31/sf $ 2,756,582
5.000 to 9,999 sf 62,893 sf@$20/sf $ 1,257,860
Over 10,000 sf TOTAL MALL STORES 93,091 sf @$17/sf 375,221 sf($27.48 average) $ 1,582,547 $10,310,461
Kiosks 3,380 sf @$105/sf $ 354,900
TOTAL RENTAL INCOME $10,665,361
Tax Year 1993
Units
Under 1,000 sf 15,709 sf @$54/sf $ 848,286
1.000 to 2,999 sf 114,606 sf @$35/sf $ 4,011,210
3.000 to 4,999 sf 88,922 sf @$32/sf $ 2,845,504
5.000 to 9,999 sf Over 10,000 sf TOTAL MALL STORES 62,893 sf @$21/sf 93,091 sf @$18/sf 375,221 sf($28.52 average) $ 1,320,753 $ 1,675,638 $10,701,391
Kiosks 3,380 sf @$110/sf $ 371,800
TOTAL RENTAL INCOME $11,073,191
To the rental income derived as aforesaid, the expert added, on a stabilized basis, telephone income of $10,000 and an administrative charge called for by the leases of 15% of operating expenses, an amount which the expert estimated at $281,000. Although the leases required the tenants to pay CAM expenses in excess of their allocable share of rentable space, the expert did not add CAM expense to plaintiffs income but took the excess recovery of CAM expenses into account in estimating his vacancy and loss allowance.
As for the expenses, the expert posited a 5% management fee, a reserve for structural repairs and contingencies of 2% of effective gross income, and an insurance expense of $35,000 for 1991, $37,500 for 1992 and $40,000 for 1993.
*518 Finally, the expert, utilizing the band of investment mortgage equity method, posited a capitalization rate of 9.45% for the first two years under review and 9.30% for the third year. The only difference was in his selection of the equity dividend rate, which he estimated to be 2.25% (30% of 7.5%) for 1993, compared to 2.4% (30% of 8%) for 1991 and 1992.
Thus, the expert’s income-based value estimate for the mall stores appears schematically as follows:
1991
Annual rental income[5] $ 10,257,243
Telephone income $ 10,000
Administrative charges $ 281,000
TOTAL GROSS INCOME $ 10,548,243
Less 5% vacancy and collection loss EFFECTIVE GROSS INCOME @ 95% $ 10,020,830
Less expenses:
Management (5%) $469,870
Insurance $ 35,000
Reserves @ 2% of EGI $200,416 $ 705,286
NET OPERATING INCOME $ 9,315,544
capitalized at 9.45% $ 98,577,186
1992
Annual rental income $ 10,665,361
Telephone income $ 10,000
Administrative charges $ 281,000
TOTAL GROSS INCOME $ 10,956,361
Less 5% vacancy and loss allowance EFFECTIVE GROSS INCOME @ 95% $ 10,408,542
Less expenses:
Management (5%) $520,427
Insurance $ 37,500
Reserves @2% of EGI $208,170 $ 766,097
NET OPERATING INCOME $ 9,642,445
capitalized at 9.45% $102,036,455
*519 1993
Annual rental income $ 11,073,191
Telephone income $ 10,000
Administrative charges $ 281,000
TOTAL GROSS INCOME $ 11,364,191
Less 5% vacancy and loss allowance EFFECTIVE GROSS INCOME $ 10,795,981
Less expenses:
Management (5%) $539,800
Insurance $ 40,000
Reserves @2% of EGI $215,920 $ 795,720
NET OPERATING INCOME $ 10,000,261
capitalized at 9.30% $107,529,688
The expert’s final conclusions of value were predicated upon a hybrid approach, pursuant to which he valued the anchors under the cost approach and the mall stores and concourse under the income approach.
His final conclusions appear as follows:
1991 1992 1993
Mall stores $ 98,575,000 $102,035,000 $107,530,000
Macy’s $ 27,697,000 $ 27,622,000 $ 27,803,000
Sears $ 18,955,000 $ 18,902,000 $ 19,023,000
L&T $ 19,813,000 $ 19,984,000 $ 20,132,000
Total $165,040,000 $168,543,000 $174,488,000
In relying upon the hybrid approach as a primary indicator of value, the expert found it was not necessary to utilize separate land values for the subject’s acreage. He also concluded, for the same reason, that he need not value the easement over the PSE & G land.
At the outset of the court’s examination of the legal and factual issues in this complicated case, it is appropriate to state that, because of the paucity of data, the income approach will not be applied in the valuation of the anchor stores. As with all owner-occupied commercial or industrial property, no hard income *520 or expense data is available. Thus, as this court said in Shulton, Inc. v. Clifton, 7 N.J. Tax 208 (Tax 1983), aff'd, 7 N.J. Tax 220 (App.Div.1984):
Dealing as he was with owner-occupied property, [the expert] was impelled to construct an amalgam of attenuated hypotheses concerning economic rent [and] projected expenses....
As stated in one authoritative work:
“The,difficulties and disadvantages of the income approach are numerous. They all revolve around the fact that a large number of estimates must be made; therefore, in most cases a complex set of relationships must be developed. The appraiser may have to inject his own analytical judgment and skill into the analysis more than is desirable. [Industrial Real Estate, supra at 478]”
The sheer number of interdependent assumptions, none of them fortified by hard data, precludes acceptance of defendant’s expert’s income approach as a viable indicator of value.
[Mat 217.]
The income approach posited by plaintiffs expert for the anchors is deficient in other ways. To begin with, in relying upon a percentage of anchor store sales as a basis for an economic rent estimate, the expert failed to consider the impact of the business disruptions attributable to the renovations performed between 1989 and 1991. Secondly, having assigned percentage rentals for the anchors in reliance, in some part, upon a Douglas Elliman Study of department store leases, he provided no details about the summary data reflected in that Study. Demographics are important,in evaluating comparability of rentals paid in store properties. Fourth Fairland, Inc. v. Hazlet Tp., 1 N.J.Tax 254, 260 (Tax 1980). He never visited any of the locations of the stores forming the basis for the Study. He knew nothing of the mix of anchors at those locations, nor was he familiar with the demographic data of the area surrounding the locations of the stores forming the basis for the Study.
Thirdly, while he referred in his testimony to the Garden State Plaza and the Lord & Taylor Fashion Center, both in Paramus, and the Newport Mall in Jersey City as a basis, in part, for his percentage rentals assigned to the subject’s anchors, he admitted that the demographics of the support areas of the Plaza and the Fashion Center were: not comparable to the Livingston Mall. Similarly, he did not know the sales volume or the size of the *521 Newport Mall. He admitted that the latter is in a different kind of location, that it is urban, not suburban, as is the subject, and that neither the population mix nor the income levels were comparable.
Finally, as a matter of law, economic rent for property tax purposes may not be determined on the basis of a percentage of gross sales. As the New Jersey Supreme Court declared in Aetna Life Ins. Co. v. Newark, 10 N.J. 99,89 A.2d 385 (1952):
Further, there is judicial authority to support a complete rejection of this type of evidence as a test for full and fair value of property for assessment purposes. For instance, in Somers v. Meriden, 119 Conn. 5, 174 A. 184, 95 ALR 434, 435, 442 (Sup.Ct.Err.1934), it was held that evidence of the financial results of the business conducted by the lessees was properly excluded inasmuch as profits or losses of the business are so commonly dependent upon causes other than the value of the premises in which it is conducted that, except in some instances as to public utilities, they are not evidence of that value____ In the present ease the theory asserted is a formula based on sales volume and therefore is subject to the variables of goodwill and management practices which are factors entirely foreign to the true value of the real estate as such. For this reason, the evidence adduced in this category was neither competent nor sufficient to establish the full and fair value of the property.
[Id. at 108-109, 89 A.2d 385.]
In the ease of Lawrence Assocs. v. Lawrence Tp., 5 N.J.Tax 481 (Tax 1983), this court stated:
[A]s the definition of the term states, a percentage lease in effect “makes the landlord a partner in the tenant’s business.” Since the amounts of percentage rent are based on the tenant’s business performance, it is conceivable that in some instances they are more indicative of the value of that business than they are of the value of real property. However, only the latter is relevant in this proceeding. The value of a tenant’s business is not subject to ad valorem tax by the municipality.
[Id. at 552.]
In Humble Oil & Refining Co. v. Englewood, Cliffs Bor., 135 N.J.Super. 26, 342 A.2d 560 (App.Div.1975), aff'd per curiam, 71 N.J. 401, 365 A.2d 929 (1976), the Appellate Division held that valuation of a gasoline service station by the gallonage method represented the business value of the station, not the real property value for local property tax purposes.
Thoughtful commentators in the field of shopping center valuation have emphasized the importance of the distinction, for proper *522 ty tax purposes, between real property value and business value. The commentators have identified rents calculated as a percentage of sales as a source of business value. See, e.g., Fisher and William N. Kinnard, Jr., The Business Enterprise Value Component of Operating Properties, 2 Journal of Property Tax Management 19, 22 (1990); George R. Karvel and Peter J. Patchin, The Business Value of Super-Regional Shopping Centers and Malls, 60 The Appraisal Journal 453 (October 1992); Robert S. Martin and Scott D. Nafe, Segregating Real Estate Value from Nonrealty Value in Shopping Centers, 64 The Appraisal Journal 1, 7 (January 1996).
As the income approach in this case is not probative of the true value of the owner-occupied anchor stores and neither expert utilized the sales comparison approach, the anchor stores -will be valued by the cost approach. Furthermore, as the non-anchor mall stores are leased and thus provide income to the mall owner, the income approach is preferable and will be used to value the non-anchor mall stores[6]. Center-Whiteman Corp. v. Fort Lee Bor., 4 N.J.Tax 153, 160 (Tax 1982). See Helmsley v. Fort Lee Bor., 78 N.J. 200, 213-214, 394 A.2d 65 (1978).
Accordingly, the cost approach will be confined to the anchor stores.
The first issue to be resolved is the proper building classification and cost rank.
Plaintiffs expert selected the Marshall classification of ‘C Masonry' for all three anchor stores and cost ranks of 2.5 (Average/Above average) for Macy’s, 2.0 (Average) for Sear’s, and 3.0 (Above Average) for Lord & Taylor. Defendant’s expert selected, for all years under review, the Marshall classification of Fireproof Steel Frame (Class A), and cost ranks of High for Maey’s, Above Average/High for Sear’s, and High for Lord & Taylor. The selections of plaintiffs expert were supported by the detailed *523 testimony and exhibits of Frank Skinner, a former Vice President and Executive of Torcon, Inc., the contractor which performed the renovations at the mall. Mr. Skinner was in charge of the renovations and appeared to have an intimate knowledge of the building composition and quality of materials used in those renovations. However, the court confined his evidence to the renovations and did not permit him to testify about the structural composition and quality of Macy’s and Sears, as the contractor’s renovations did not include those stores, and thus, Mr. Skinner could not testify of his own personal knowledge about them.
The selections of defendant’s expert were supported by (1) the testimony of Richard O’Keefe, defendant’s building inspector and Construction Code Official, (2) the requirements of the BOCA Code, which the parties acknowledge was in force in Livingston at all times pertinent hereto, (3) the renovation contract for the Lord & Taylor store, and (4) the construction drawings.
The evidence preponderates overwhelmingly in defendant’s favor on this issue.
To begin with, Mr. O’Keefe testified, and stated in his report, which is in evidence[7], that the Code requires that enclosed malls must be of Types 1, 2 or 4. On the basis of his observations and review of construction plans of the mall, he concluded that the mall was of a Type 2 construction, which fits the Marshall description of a Class A building. Defendant, through Mr. O’Keefe, also introduced plans for the renovation of Lord & Taylor, which indicate the requirement for fireproofing, which, as indicated above, is a characteristic of a Marshall Class A building.
On cross examination, Mr. Skinner admitted that the steel framework of the Lord & Taylor store was fireproofed. Furthermore, the specifications and drawings for the Lord & Taylor renovations required replacement of fireproofing of the existing steel columns and beams.
*524 The many photographs in evidence, as well as observations made during the inspection tour of the premises by representatives of the parties and the court, indicate concrete-on-steel decking throughout the mall and the anchor stores.
Mr. Skinner suggested that the interior finish of the Lord & Taylor store fits the Marshall description of Class A, with a cost rank of Low, or a Class C with a cost rank of Good. In this connection, he proffered a range of $50 in unit costs. In the face of this unbridled speculation, the court is impelled to wonder why plaintiff, either through Mr. Skinner or another witness, failed to produce hard data, which was certainly within plaintiffs possession, showing the actual costs of the renovations performed at the Lord & Taylor store. Actual costs, after all, are some evidence of value when the cost approach is used. Bostian v. Franklin State Bank, 167 N.J.Super. 564, 569-70, 401 A.2d 549 (App.Div.1979). Plaintiffs failure to come forward with such evidence permits the court to infer, and it does infer, that such evidence would have been adverse to plaintiffs position. Inwood at Great Notch v. Little Falls Tp., 6 N.J.Tax 316, 331 (Tax 1984); Wild v. Roman, 91 N.J.Super. 410,220 A.2d 711 (App.Div.1966).
In view of the foregoing, the court concludes that the Marshall building classifications and cost ranks utilized by defendant’s expert are appropriate in the development of true value under the cost approach for the anchor stores. As plaintiffs selections of building classification and cost ranks are not supported by the credible evidence, they will be disregarded. The probative utility of an expert’s opinion rests entirely upon the facts and reasoning offered in its support. Dworman v. Tinton Falls Bor., 1 N.J.Tax 445, 458 (Tax 1980), aff'd o.b. per curiam 3 N.J.Tax 1, 180 N.J.Super. 366, 434 A.2d 1134 (App.Div.), certif. denied, 88 N.J. 495,443 A.2d 709 (1981).
The next issue to be resolved is the propriety of the add-on of defendant’s expert for what appears to be contractor’s overhead of 10% in addition to an entrepreneurial profit of 10%. (The use of an entrepreneurial profit is not in issue, as plaintiffs expert also uses it, and in the same amount.) According to the Marshall *525 Valuation Manual, relevant parts of which are in evidence, contractor’s overhead is included in the costs. Thus, that addition will not be accepted.
The next issue to be resolved in the cost approach is the measurement of accrued depreciation. In view of the extensive renovations to the Lord & Taylor store, which could also be termed the construction of the store, in view of the departure of Hahne’s and the complete gutting of the area formerly occupied by Hahne’s, and also in view of the structural composition and quality of the other mall stores, the court accepts the accrued depreciation posited by defendant’s expert.
The last issue to be resolved in the use of the cost approach in valuing the anchors is whether, as plaintiff contends, the cost-determined value of the anchors should be reduced because some of the anchors’ value is reflected in the value of the mall stores. While the court recognizes that, as a general rule, anchor stores are indispensable to the prosperity of a mall and the merchandising success of the mall tenants, there is no evidence in this case from which the transfer of value from the anchors to the mall stores could be quantified, nor is there any proof of the nature of any such transfer, even if it could be quantified. Is it business value or real property value? No conclusions can be drawn from this record. See Paramus Bor. v. Etaner Enterprises, 14 N.J.Tax 208, 216 (Tax 1994), aff'd o.b. 15 N.J.Tax 217, 219 (App.Div.), certif. denied, 143 N.J. 319, 670 A.2d 1061 (1995). Mays Center Assocs. v. Rockaway Tp., 13 N.J.Tax 431 (Tax 1993), aff'd o.b. per curiam 15 N.J.Tax 168 (App.Div.1994).
Plaintiffs income approach to the valuation of the mall stores is fundamentally flawed. To begin with, for the reasons stated above with regard to the income-derived valuation of the anchors, the use of percentage leases is inappropriate in ascertaining the true value of income-producing property for tax valuation purposes. Secondly, the use of old leases is not probative of true value of the property subject to those leases. The expert’s explanation that the percentages of sales volume had not changed *526 since the mall opened in 1971, even if percentage leases could be used, is contradicted by plaintiffs Senior Vice President, Michael Maloney, who testified not only that contract rents in 1971 and 1972 were far below contract rents on the valuation dates, but also that the minimum rent levels have dramatically increased. This datum is more significant than the percentages of gross sales for the mall leases since the percentages do not apply until the minimum rent levels (or break points) have been achieved.[8] The mall leases were structured so that the percentage of gross sales applied only to sales volume in excess of the natural breakpoint. Even if the actual rents payable in 1971 and 1972 were totally functions of a percentage of sales, they are not reliable to establish economic rent in either 1971 and 1972 or on the valuation dates in this case. The evidence does not disclose whether percentage rents were economic either in the earlier years or on the valuation dates before the court.
The conclusions regarding economic rent proffered by defendant’s expert, on the other hand, are, with the notable exception of the kiosks, amply supported by the data in his appraisal and by other credible evidence in the record. His addition of administrative charges is supported by the leases themselves, while his addition of tenant improvements is a reasonable extrapolation of the actual expenditures for leasehold improvements made by the tenants as reflected in the building permits in evidence. Those improvements must be accounted for in arriving at the true value of the subject property. Wayne Mall, Inc. v. Wayne Tp., 2 N.J.Tax 1 (Tax 1980); Lawrence Assocs. v. Lawrence Tp., supra, 5 N.J.Tax at 553-554.
His estimate of telephone income, while not supported by hard data, is nevertheless a reasonable — and modest — projection of income from that source.
*527 His vacancy and loss allowance, which takes into account the CAM overcharge, is a reasonable forecast of the long term quality and durability of the income stream. RTC Properties v. Kearny, 13 N.J.Tax 146 (Tax 1993).
Defendant’s expert, however, offered no support for his value estimates for the kiosks. Plaintiffs expert, on the other hand, proffered current rentals for the kiosks, and the court finds the economic rent for those items to be as posited by that expert, namely, $179,800 for each year under review. No credible support was tendered for landlord expenses of 30% relative to the kiosks.[9]
The expenses posited by defendant’s expert are more credible than the undifferentiated estimate of plaintiffs expert.
Finally, both experts, relying upon the same data, agree upon a weighted capitalization rate for the first two years under review. Defendant’s reduction in the equity dividend rate for the third year under review is not supported by the financial data in evidence. Thus the court finds the appropriate capitalization rate to be 9.45% for all three years under review.
In view of the foregoing, the court finds the true value of the subject property to be $157,093,500 for tax year 1991, $160,843,000 for tax year 1992, and $164,900,700 for tax year 1993, developed under the hybrid approach (cost for the anchors, income for the mall stores)[10] and composed as follows:
*528 1991
Mac/s $ 25,179,154
& T 18 012192
Sears 17,232,358
Mall $157,093,577 rounded to $157,093,-500
1992
Macj^s $ 25,111,350
Sears 17,183,936
L & T 18,167,424
Mall 100,380,350 $160,843,060 rounded to $160,843,-000
1993
Macy’s $ 25,276,801
Sears 17,293,947
L & T 18,302,130
Mall 104,027,850 $164,900,728 rounded to $164,900,-700
The general average ratio and the upper and lower limits of the common level range promulgated by the Director, Division of Taxation, for defendant taxing district were as follows:
Lower Limit Average Ratio Upper Limit
1991 23.05 27.12 31.19
1992 24.20 28.47 32.74
1993 23.50 27.65 31.80
*529 The ratios of the assessments to the true values of the subject property as herein found were as follows:
1991— 29.48%
1992— 28.78%
1993— 28.08%
As the ratio of assessment to true value is within the common level range for all three years involved, the assessments will be affirmed. Judgment will be entered accordingly.

A super-regional mall (or shopping center) is defined as "[a] shopping center that offers an extensive variety of general merchandise, apparel, furniture, home furnishings, services, and recreational facilities built around at least three major department stores of at least 100,000 square feet each____" Appraisal Institute, The Dictionary of Real Estate Appraisal, (3rd ed. 1993) p. 358. The subject property fits that description.

 An anchor store (or tenant) is defined as "[t]he major store within a shopping center that attracts or generates traffic for the facility, e.g., a supermarket in a neighborhood shopping center, a major chain or department store in a regional shopping center." Id. at 4.

 The evidence shows, that of the leases in existence on the valuation dates, 37 were commenced in 1971 and 1972, 31 commenced between 1973 and 1986, and 24 commenced between 1987 and 1990.

 The expert constructed an income for the anchors, but he placed no reliance on that approach, as supporting data was not available. The anchors are all owner-occupied, and any projection of income and expense is entirely hypothetical. As will be seen, the expert relied upon a hybrid approach, valuing the anchors under the cost approach and the mall stores under the income approach.

 The economic rent posited by defendant’s expert included rent for the kiosks of $100 per square foot for 1991, $105 per square foot for 1992 and $110 per square foot for 1993.

 Hereinafter, the non-anchor mall stores will be referred to, simply, as the mall stores.

 Relevant portions of the BOCA Code are attached to his report.

 The break point in overage leases is that level of gross sales volume which, if the specified percentage applied to the first dollar of sales, would produce the minimum guaranteed rent.

 While the kiosks, given their mobility and lack of physical attachment to the realty, appear to be items of personal property, the evidence shows that the rent charged for their use covered not only the kiosks themselves but the space they occupied in the mall concourse. As the evidence fails to show an allocation between rent charged for the kiosks and rent charged for mall space the court is compelled to find that the entire amount charged for the kiosks is includible in mall income for the purpose of this case.

 For the reasons stated in this opinion, the cost approach was calculated using the estimates proffered by defendant's expert, including his estimates of accrued depreciation but excluding a 10% contractor’s overhead. The income approach adopted by the court also relied upon data submitted by defendant’s expert. The only modification in that regard was the substitution of rental income for the kiosks posited by plaintiffs expert for the kiosk income assumed *528 by defendant’s expert. A capitalization rate of 9.45% was applied to the net operating income for each year before the court.
It will be noted that, even though the court finds the cost approach to be most reliable in determining the true value of the anchor stores, no value has been ascribed to the land underlying those stores. The court's ability to make a finding of true value of the underlying land was hampered by an inadequate record. While the evidence indicates that the anchor stores paid rent to plaintiff under land leases, no proofs were offered as to the amounts of such rents. Moreover, plaintiff's expert submitted no comparable land sales but chose to rely upon the equalized value of the land assessments for his land value estimates, an approach which this court finds completely unacceptable. Defendant's expert's vacant land sales were simply not probative. The different uses and the vast differences in size rendered meaningful comparisons impossible.